UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MICHAEL VAN HISE and ROBERT
CHRISTOPHER ASCH,

                              Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/8/17

**MEMORANDUM
OPINION & ORDER**

(S4) 12 Cr. 847 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

    The Government charged Defendants Michael Van Hise, Robert Christopher

Asch, and Richard Meltz with two separate conspiracies to commit kidnapping, in violation of 18

U.S.C. § 1201(c). (S4 Indictment (Dkt. No. 204)) In Count One, the Government alleges that

between the spring of 2011 and January 2013, Van Hise, Asch and Meltz participated in a

kidnapping conspiracy. The Government contended at trial that the targets of this kidnapping

conspiracy were members of Van Hise's family, including his wife – Bolice Van Hise – his

sister-in-law – Sheri Davis – and Davis's four minor children. (Trial Transcript ("Tr.") 21, 1336-

37, 1512) In Count Two, the Government alleges that between January 2013 and April 15, 2013,

Asch and Meltz participated in a kidnapping conspiracy. The alleged target of this conspiracy

was a woman who – unbeknownst to the Defendants – was an undercover agent of the Federal

Bureau of Investigation ("FBI"). (Tr. 25, 1336, 1346-47, 1513)

    On January 16, 2014, Meltz pleaded guilty to a two-count superseding

information. Meltz was charged, in Count One, with conspiring to kidnap "Victim-1," a

"specific woman." (S5 Information (Dkt. No. 242) at ¶¶ 1-3) In his allocution, Meltz admitted

that he had provided advice to Asch "regarding the kidnapping of an adult relative of Michael

Van Hise," and that he had "assisted in the planning of the kidnapping." (Jan. 16, 2017 Tr.

(Meltz guilty plea allocution) (Dkt. No. 257) at 27[1])  In Count Two of the S5 Information, Meltz was charged with conspiring to kidnap the female undercover FBI agent.  (S5 Information (Dkt. No. 242) ¶¶ 4-6)  In his allocution, Meltz admitted to providing "advice and assistance in the planning of [that] kidnapping."  (Jan. 16, 2017 Tr. (Meltz guilty plea allocution) (Dkt. No. 257) at 27)

Van Hise and Asch proceeded to trial on the charges contained in the S4 Indictment.  On March 14, 2014, a jury returned guilty verdicts against Van Hise and Asch on Count One, and against Asch on Count Two.  (Verdict Form (Dkt. No. 277))  Having timely moved for a judgment of acquittal at the close of the Government's case, and this Court having reserved decision, Van Hise and Asch now renew their joint motion for a judgment of acquittal on Count One pursuant to Fed. R. Crim P. 29.  Asch also renews his motion for a judgment of acquittal on Count Two.  In the alternative, both Defendants seek a new trial pursuant to Fed. R. Crim. P. 33.  For the reasons set forth below, Defendants' motions will be denied in their entirety.

## BACKGROUND

The charges in this case have their origin in the Government's investigation of former New York City Police Department officer Gilberto Valle.  (Tr. 54)  In September 2012, the FBI learned that Valle had been communicating over the internet with several individuals, including Van Hise, about kidnapping women.  (Cmplt. (Dkt. No. 1, United States v. Van Hise, 13 Mag. 0011) ¶¶ 5, 7; Cmplt. (Dkt. No. 1, United States v. Valle, 12 Mag. 2820) ¶ 15)  Valle was arrested on October 24, 2012, and was later charged with conspiracy to commit kidnapping,

---

[1] The page numbers of electronically filed documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

in violation of 18 U.S.C. § 1201(c), and with unauthorized use of a federal database, in violation of 18 U.S.C. § 1030(a)(2)(B).[2] (Indictment (Dkt. No. 9, <u>United States v. Valle</u>, 12 Cr. 847 (PGG))); <u>United States v. Valle</u>, 301 F.R.D. 53, 78 (S.D.N.Y. 2014), <u>aff'd in part, rev'd in part</u>, 807 F.3d 508 (2d Cir. 2015). Although the Government did not contend – at the trial of Van Hise and Asch – that Valle was a co-conspirator,[3] the jury heard testimony indicating that the FBI first learned of Van Hise as a result of its investigation of Valle's emails and Internet chats. (Tr. 54, 138, 363, 402-03)

## I.  VAN HISE'S COOPERATION WITH THE FBI

On October 26, 2012 – two days after Valle's arrest – FBI agents executed a search warrant at the Hamilton, New Jersey home of Van Hise's grandparents, where Van Hise was then residing. (Tr. 55, 306) At the outset of the search, agents asked Van Hise's grandfather to contact Van Hise – who was not present – and inform him that the agents wished to speak

---

[2]  The <u>Valle</u> case proceeded to trial on February 25, 2013. At the <u>Valle</u> trial, the Government contended that Valle had conspired with three individuals to kidnap young women: "Michael Van Hise, a man from New Jersey who was known to Valle as 'mikevanhise81@aol.com' and 'michael19902135@yahoo.com'; an unidentified individual apparently located in Pakistan who used the screen name 'Aly Khan'; and Dale Bolinger, a man in England who was known to Valle only by his screen name, 'Moody Blues.'" <u>United States v. Valle</u>, 807 F.3d 508, 512 (2d Cir. 2015) On March 12, 2013, a jury found Valle guilty on both counts. (Verdict Form (Dkt. No. 126, <u>United States v. Valle</u>, 12 Cr. 847 (PGG))) This Court subsequently granted Valle's motion for a judgment of acquittal as to the kidnapping conspiracy charge, finding that the Government had not proven beyond a reasonable doubt that Valle's internet "chats" about kidnapping women were anything more than fantasy. <u>United States v. Valle</u>, 301 F.R.D. 53, 59 (S.D.N.Y. 2014). The Government appealed the Court's ruling, but the Second Circuit affirmed. <u>United States v. Valle</u>, 807 F.3d 508.

[3]  At Van Hise and Asch's trial, the jury was instructed that the Government did not contend that Valle was a co-conspirator:

> There's no allegation in this case, and there is no charge in this case[,] that either Mr. Van Hise or Mr. Asch conspired to commit any crime with Mr. Valle, or that either Mr. Van Hise or Mr. Asch committed a crime with Mr. Valle. That's not part of this case.

(Tr. 62)

with him.  Van Hise returned home, approached the agents, and – without prompting – stated,

"[T]his is about the e-mails, isn't it?"  (Tr. 57)  The agents then asked whether Van Hise would

be willing to speak with them, and Van Hise agreed to be interviewed at a local FBI field office.

(Tr. 58-59)

> During the ensuing interview, Van Hise told the agents – inter alia – that

> he regularly visited the Dark Fetish Network ("DFN"), which he described as a
> "Facebook-type" website for "people with fetishes";

> "after a number of years of [accessing DFN], he was able to quickly look at a user
> or somebody that was on [DFN] and identify whether or not he thought they were
> just fantasy or whether they were somebody that was looking to carry out the
> fantasy for real or . . . had maybe already done [so]";

> of "thousands" of people who use DFN, he "migrated" towards the "few dozen"
> who were "serious about acting out their fantasies, or those that might have even
> acted out a fantasy already"; and

> he was in contact with an individual he believed was actively looking to rape and
> kill a real victim.

(Tr. 63-65)  Van Hise told agents that the reason he "migrated" to DFN users who were looking

to carry out a real crime, or had already done so, was because he intended to give this

information to law enforcement.  (Tr. 65)

> Between October 26, 2012, and his arrest on January 4, 2013, Van Hise

voluntarily spoke with FBI agents "at least" once a week.  (Tr. 67)  While those discussions were

ongoing, the FBI obtained search warrants for three of Van Hise's email accounts.  (Tr. 66, 140)

The search warrants revealed "hundreds" of emails, many of which involved matters of a

"violent sexual nature."  (Tr. 141)  During the period that Van Hise was cooperating with the

FBI, he was not charged with a crime nor was he subject to any sort of surveillance.  (Tr. 94)

> The FBI's analysis of Van Hise's email ultimately focused on his

communications with Christopher Asch – a former Stuyvesant High School librarian – and

Richard Meltz, a retired New Jersey municipal police officer who was then employed as a police officer for the U.S. Department of Veterans Affairs. (Tr. 391, 446) The FBI subsequently obtained search warrants for Asch and Meltz's email accounts. (Tr. 143)

## II.    THE VAN HISE/ASCH/MELTZ KIDNAPPING CONSPIRACY

The bulk of the evidence concerning Count One consists of electronic communications – emails and internet "chats" – between (1) Van Hise and Asch; (2) Van Hise and Meltz; and (3) Asch and Meltz.[4] (Tr. 64) In the emails, Asch uses his real name, (e.g., GX 201, 203, 252); Van Hise uses his real name and the alias "Michael S," (e.g., GX 203, 210, 252, 1113; see Tr. 64, 1001); and Meltz uses the pseudonym "John Retic."[5] (E.g., GX 203, 210, 214; see Tr. 142, 148, 155).

### A.    The Formation of the Relationship Between Asch and Meltz

The Government's proof began with a series of June 2008 emails that appeared to document the beginning of the relationship between Asch and Meltz. (GX 201, GX 202) In these emails, Asch and Meltz discuss, inter alia, their "preferred method[s]" for murdering female victims; their mutual frustration at not finding a "real partner" who "you can trust"; their mutual desire to avoid being "caught"; and their plans to communicate by telephone and possibly meet in person. (Id.)

---

[4] Although the three men engaged in frequent electronic communication with each other, the Government did not introduce any communication in which all three simultaneously participated. (Tr. 369)

[5] Notwithstanding Meltz's use of a pseudonym, Asch and Van Hise commonly refer to him in their electronic communications as "Rick." (Tr. 142, 168, 172, 193, 254; see, e.g., GX 222, 216, 229)

In a June 20, 2008 email, Meltz – using the alias "John Retic" and email address

"ruhmal2001@yahoo.com" – gives Asch background information about himself and his

interests:

> . . . I will plan on calling you this Monday after work so we can talk freely about
> our desires. Perhaps some Saturday morning we can meet for breakfast [and] see
> where it goes from there. I will tell you there is nothing too extreme for me so
> feel free to tell me all you desire. Being married I have to be somewhat discreet
> until we know each other better. I live about 45 minutes - 1 hour from you. My
> desires run very dark and very deep. I work out and have strong hands and arms.
> Buono and Bianchi, Mickey and Mallory, Albert DeSalvo, Ted Bundy and others
> spark my interest. I am not much into blood, but strangling, smothering,
> drowning and snuff in general arouse me. again I enjoy emailing you and as we
> get to know [e]ach other better I will be freer and more open. I have been seeking
> a partner for a long time, someone who feels like I do and I can trust. Let me
> know a little more about you. Just knowing you are there and so close arouses my
> interests.

(GX 201 (June 20, 2008, 06:00:22 PDT -0700))[6]

Asch – using his own name, "Chris Asch," and the email address

"pudinhand@hotmail.com" – replies:

> i understand the need for discretion so please don't worry. i too have been
> looking for a partner or partners for a long time. actually, it's not that hard to find
> a partner, but one you can trust and isn't reckless, deeply depressed or abusing
> drugs is a lot more difficult. my fantasies also run very dark and deep. i don't
> have any experience, principally because i haven't felt i could do a scene safely
> and because i have no interest in being caught. i would love to be able turn some
> of these fantasies into realty and have stayed hopeful that it'll be possible to meet
> some guys like myself.

---

[6] The emails and Internet chats introduced at trial contain grammatical and typographical errors.
These communications are reproduced here unedited. Any alteration is indicated by the use of
brackets.

The emails and Internet chats introduced by the Government use military and non-military times
interchangeably. (See, e.g., Tr. 165-66, 169, 177-79) The emails and chats also contain
references to multiple time zones, although all communications took place in the Eastern
Standard time zone. This opinion reflects the times as specified in the exhibits introduced at
trial. In any event, the precise times of the emails and chats is not material to this Court's
determination to deny Defendants' post-trial motions.

like yourself, i'm not that much into blood. my preferred method is strangulation - less muss and fuss. i do have a fantasy of cutting some new holes in a victim, particularly if we're a small group, so everyone could fuck at the same time. i am open to other methods however, and snuff in general gets me hard. one suffocation fantasy i have is to use our dicks as weapons and cut off a vic's air by shoving them down a throat. i also would like to choke out a vic at the point of orgasm.

nothing's too extreme for me either and i'm also interested in necro, cannibalism, and have no boundaries as far as age is concerned except maybe at the upper end. some of the guys who interest me are bundy, dahmer and pairs like lucas and toole.

i'm glad you're so close and would love to meet for breakfast some sat. i'll plan to be around on mon. afternoon so we can talk.

(Id. (undated reply email))

Meltz responds, "I have no desire to be caught either so we are on the same page there." (Id. (June 23, 2008, 09:54:19 -0700 PDT)) He assures Asch that he is "not reckless, deeply depressed or a drug abuser," and agrees that "[f]inding a real partner is very very difficult." (Id.) Meltz concludes, "There is much we can discuss and talk about. I am looking forward to talking with you this afternoon about 430- 5 pm." (Id.)

Subsequent emails confirm that Asch and Meltz spoke over the phone on or about June 23, 2008:

| | |
|---|---|
| **Chris Asch:** | it was great talking with you today! i'm looking forward to talking again and discussing fantasies and possible plans so feel free to call when the opportunity arises. it sounds like you know yourself pretty well and have fully thought through the various emotions that come up. even if we never get to actually put anything into reality it will be fun to plan. i have a feeling this is the start of something good and that we will eventually have the chance to do some scenes. take it easy. chris |
| **JOHN RETIC:** | I also felt very good and relaxed talking to you, which is not the usual case with me. I am looking forward to actually meeting and seeing where it goes from there. I will send another email later when I have more time. John |

(GX 202 (undated Asch email); id. (June 24, 2008 09:54:19 -0700 PDT))

During the time periods of the charged conspiracies, Asch and Meltz regularly communicated over the Internet. They also spoke frequently by telephone, as evidenced by conversations the FBI intercepted between February and April 2013, pursuant to a court-authorized wiretap on Asch's telephone. (See, e.g., GX 401, 402, 404, 405, 406, 409, 413, 418) Asch – who lived in Manhattan – and Meltz – who first resided in New Jersey and then moved to Nashua, New Hampshire – met in person on at least one occasion. (Tr. 355, 449, 720; GX 267 (Dec. 18, 2012, 03:27:37 (UTC)), GX 352 (Jan. 18, 2013)) Indeed, Asch told Van Hise and an undercover FBI agent that he had visited Meltz at his home and had spent time in his basement, where Meltz claimed to have previously strangled two women. (Tr. 449-50; GX 252 (Sept. 4, 2012, 3:55 p.m.); see also Tr. 499, 561, 694)

**B.    Van Hise's 2012 Meeting with Asch**

The evidence at trial indicates that Van Hise communicated with Asch through the DFN website, as well as off-line, via email. (Tr. 165; see, e.g., GX 205 (Mar. 1, 2012, 15:12:30 -0500))

In early 2012, Van Hise and Asch met in Trenton, New Jersey, where Van Hise lived.[7] (Tr. 56, 72, 448; GX 208 (May 30, 2012, 21:21:25 (UTC)); see Tr. 129) Van Hise drove Asch around Trenton in his "white [station] wagon," showing him a bar where they could "pick up a hooker," and two locations that Van Hise thought might be suitable for "dumping" a female

---

[7] Although the S4 Indictment alleges that this meeting took place in the spring of 2011 (see S4 Indictment (Dkt. No. 204)), the evidence at trial indicates that the meeting took place later. In a January 5, 2013 telephone conversation with an undercover FBI agent, Asch states that he "met [Van Hise] about a year ago, in person," indicating that this meeting took place in early 2012. (GX 361-T (Jan. 5, 2013) at 1)

victim's body.[8]  (GX 205 (Mar. 1, 2012, 4:04 p.m.), GX 252 (Sept. 4, 2012, 2:29 p.m.), GX 352-

T at 1-2)  During a recorded conversation with an FBI undercover agent on January 18, 2013,

Asch described his meeting with Van Hise as follows:

> We talked about, you know, a number of things, I mean we drove around Trenton,
> he showed me this bar that he sometimes went to that he thought would be good
> so I, you know pick up a hooker, we drove down an alley that he thought would
> be a really good place to dump someone, I mean it was too residential first of all,
> it was uhm, so we talked about a lot of things, he took me to a park where he
> thought would be a good dumping ground but you know I thought this is you
> know, no, you need to go to the mountains or something. . . .

(GX 352-T (Jan. 18, 2013) at 1-2)[9]

      After his January 4, 2013 arrest, Van Hise was given <u>Miranda</u> warnings, waived

his rights, and agreed to speak with agents.  (Tr. 69-71)  In his post-arrest statement, Van Hise

admitted that he had met Asch in Trenton and discussed a potential kidnapping with him.

(Cmplt. (Dkt. No. 1, <u>United States v. Asch and Meltz</u>, 13 Mag. 973) ¶ 8)  Although the

Government was precluded at trial from eliciting that Van Hise had implicated Asch in his post-

arrest statement, the Government was permitted to elicit – consistent with <u>Bruton v. United</u>

<u>States</u>, 391 U.S. 123 (1968) – that Van Hise told agents he had "met with another individual in

---

[8] At trial, Van Hise stipulated that he drove a white station wagon between 2010 and 2012.  (GX 1005; Tr. 1117)

[9] Evidence concerning this in-person meeting was received without objection. To the extent references to this meeting are found in Van Hise and Asch's electronic communications, they are admissible against each man as admissions or co-conspirator statements.  (Tr. 288-89; GX 1003) Likewise admissible were Asch's statements to "Darren," an undercover FBI agent, about his meeting with Van Hise. As this Court explained in its December 31, 2013 Opinion & Order denying Van Hise's severance motion, <u>see United States v. Van Hise</u>, No. S4 12 CR 847 PGG, 2013 WL 6877319, at *10-*12 (S.D.N.Y. Dec. 31, 2013), Asch's statements to the undercover agent are admissible against both Defendants because they (1) are not testimonial, given that Asch had no knowledge that the undercover agent was a law enforcement officer; (2) constitute statements against Asch's penal interest under Federal Rule of Evidence 804(b)(3); (3) are self-inculpatory, because they describe acts that Asch and Van Hise committed jointly, and (4) are corroborated by other evidence – <u>e.g.</u>, Van Hise's own emails – that confirms their trustworthiness. <u>See id.</u>

Trenton, New Jersey, in connection with a kidnapping"; that "that individual took a train from Manhattan to Trenton, New Jersey"; and that Van Hise "drove the two of them around the town, and that they looked at women and discussed different ways that they could rape and kill those women." (Tr. 72)

### C. Communications Regarding the Kidnapping, Rape, and Murder of Van Hise's Family Members

Beginning in March 2012, and continuing until the October 26, 2012 search of Van Hise's grandparents' home, Van Hise, Asch, and Meltz engaged in numerous electronic communications in which they discussed kidnapping, raping, and murdering Van Hise's wife, sister-in-law, and the sister-in-law's four young children.

The first such email exchange introduced by the Government took place on March 1, 2012. The exchange begins with Van Hise sending Asch sexually suggestive photographs of an unidentified "white girl." (GX 203 (Mar. 1, 2012, 15:12:30 -0500)) Van Hise tells Asch that he's "getting hard" and is "curious" about what Asch "want[s] to do to them" – the "them" being an apparent reference to the "white girl" as well as other women whose photographs Van Hise had transmitted to Asch. (Id. at 15:18:52 -0500) Asch responds that he would like to "overwhelm and outnumber them," and that he and Van Hise "should stuff each hole and maybe do a double vag or double anal to really stretch their holes open. would love to fist them too. we should keep all their holes filled all the time, though." (Id. at 15:29:20 -0500)

The March 1 email conversation then turns to Van Hise's sister-in-law, Sheri Davis. (Tr. 167) Van Hise asks whether Asch is "still going to try and help me do my sis in law[?]" (GX 203 (Mar. 1, 2012, 15:22:49 -0500)) Asch replies, "i don't think you should be involved with your sister-in-law, because you might [be] considered a suspect. she should probably be on your list of vics that your buddies could help you with." (Id. at 3:26 p.m.) Van

Hise does not respond to Asch's concerns, but instead returns to the "white girl" whose photograph he had shared with Asch minutes earlier: "should I strangle the bitch tonight or just fuck and wait for you to go back with me to kil her[?]" (Id. at 15:29:20 -0500)

Asch responds with a litany of practical concerns: "what are the circumstances[?] will you be at her house? in the park? somewhere else? in the car? what will you do with it afterwards?"[10] (Id. at 15:34:59 -0500) Van Hise answers that he will "more than likely" be at the victim's house and that he "want[s] to use [his] car and dump her body in the woods." (Id. at 15:34:59 -0500) Asch urges caution, noting that "that seems risky to me. too much of a chance that someone would come across it. let me talk to rick and see if he can get away at all. he knows a number of spots in the poconos that are very isolated and where it wouldn't be necessary to bury it." (Id. at 3:41 p.m.) "Rick" is an apparent reference to Richard Meltz. (Tr. 168-69)

Van Hise agrees with Asch that it would be preferable to wait: "i think i should wait and anyway id prefer to have your help and for you to be there anyway." (GX 204 (Mar. 1, 2012, 15:36:45 -0500)) Asch responds, "exactly. i always think it's good to have guys to help. too much can go wrong. i think there's safety in numbers." (Id. at 3:51 p.m.) Although Van Hise "agree[s]," he writes that he "just cant wait," because he "just turned 22" and is "waiting for fun." (Id. at 15:52:40 -0500) Asch empathizes but counsels patience: "i know how exciting it can be. i've been waiting for years. rick hasn't done anything in close to twenty years. good things come to those who wait, however. it's easy enough to do this. not getting caught is the

---

[10] In the emails and recorded conversations introduced at trial, Asch repeatedly refers to potential female victims as "it."

hard part. we have to minimize the risk to us and do it when the circumstances are right." (Id. at 3:56 p.m.)

In an apparent reference to their in-person meeting in early 2012, Van Hise asks, "when do you think the next time we could meet up is so we can look at some good spots to dump and also I can show you some of the girls i want." (GX 203 (Mar. 1, 2012, 15:42:45 -0500)) Asch responds that "it's going to be hard because of my partner's being sick. it's difficult for me to leave him alone for very long. but we'll see. would like to see you too." (Id. at 3:44 p.m.) Van Hise replies, "well let me know as soon as we can[.] i can get off work and meet you and we can start planning." Asch responds, "sounds good." (Id. at 15:44:50 -0500, 3:46 p.m.) Later in their email exchange, Van Hise asks whether their next meeting "would be this month or next[?]" (GX 205 (Mar. 1, 2012, 16:07:32 -0500)) Asch explains, "more likely next. it all depends on my partner's health. i may not be able to go anywhere for a while, unfortunately." (Id. at 4:09 p.m.) A few minutes later, Asch tells Van Hise, "i'll try to stay in touch as best i can. i miss talking to you too and one of these days we'll get together." (Id. at 4:17 p.m.) Van Hise replies, "i hope so bro cause i cant wait to do this with you." (Id. at 16:18:33 -0500) Asch replies that he is "hot to do it too," but "just want[s] us to be safe." (Id. at 4:23 p.m.)

The March 1 email exchange then turns to a transvestite whose photograph Van Hise has also apparently sent to Asch. The two men exchange ideas about what they would "do" to this individual, and Asch describes how he would like to "torture whatever it has: cock and balls if it still has them. if not, torture its cunt lips and tits if it has them." (GX 206 (Mar. 1, 2012, 4:34 p.m.)) Asch also proposes that he and Van Hise kill the victim by using their "dicks to stuff its throat hole to cutt off its air. i'd actually love to snuff a bitch with my dick down its

throat." (Id. at 4:40 p.m.) Van Hise replies, "i would to[o] and still also do the new born that

way like you suggested." (Id. at 16:41:25 -0500) Asch responds, "yeah, it'd be hot to hold an

infant between us so we could fuck both ends." (Id. at 4:43 p.m.) Van Hise replies, "especially

if its my sis in laws" (id. at 16:44:37 -0500), an apparent reference to Van Hise's one-year-old

niece. (Tr. 141).

Van Hise goes on to write that he doesn't "thin k thatl ever happen," but Asch

responds, "who knows? it could happen if the circumstances are right." (GX 206 (Mar. 1, 2012,

4:46 p.m.)) Van Hise expresses concern that they would have to deal with Van Hise's sister-in-

law, Sheri Davis, and her three other children if they decided to target the infant. (Id. at 16:47:18

-0500) Asch acknowledges that it would be "more complicated," but opines that it is "still

possible." (Id. at 4:49 p.m.) Van Hise responds that he "hope[s] so," because he "want[s] [his]

sis in law so bad even if we just rape her after getting her drunk so she doesnt remember

anything i dont care." (Id. at 16:50:08 -0500)

Approximately three months later, on May 30, 2012, Asch and Meltz engage in an

electronic chat, during which Meltz (using the email address "ruhmal2001," see Tr. 145)

proposes "coming to the city to hunt" for a victim with Asch (using the "moretime2read" email

address, see Tr. 145):

| | |
|---|---|
| ruhmal2001: | I am taking [sick leave] so I could come to you on a weekday |
| ruhmal2001: | maybe pick up a hooker to strangle |
| moretime2read: | that might work. i just have to see how my partner is an now i have a sick cat that needs meds twice a day, but i'm sure that can be worked around. |
| ruhmal2001: | I have been there with sick pets |
| ruhmal2001: | I understand |

(GX 207 (May 30, 2012, 21:07:11 (UTC) to 21:20:36 (UTC)))

Asch and Meltz then discuss various locations in New York City where they might be able to pick up a prostitute. Meltz states that he has "no idea" where prostitutes hang out at night, but Asch responds that "mike in nj" – an apparent reference to Van Hise – "showed me a bar in trenton that he thought was a good place to pick up some trash." (GX 208 (May 30, 2012, 21:20:50 (UTC)), 21:21:25 (UTC)) Meltz opines that it would be "better" to try and find a prostitute "someplace closer" to where Meltz lives. (Id. at 21:22:17 (UTC) to 21:25:53 (UTC))

In the summer of 2012, Van Hise – having already told Asch about his desire to rape and murder his sister-in-law and her children – begins discussing the same subject with Meltz. In a June 30, 2012 email, Van Hise asks Meltz, "would you help me do my sis in law and her kids[?] i can describe them to you[.]" (GX 209 (June 30, 3012, 9:05 a.m.)) Meltz replies, "oh yes to do family is a special treat she would certainly let you in and she would trust you until she felt thecord tightening around her lovely neck." (Id. at 16:56:42 -0700 (PDT)) Van Hise writes, "great that you like that idea and also shes black slim about 140 weight med breast and long sexy legs and great hips also great dick sucking lips also the kids are from 9 to 1[, t]he 9[-year-old] i want to rape and hang." (GX 210 (July 4, 2012, 11:43:17 -0700 (PDT))

Ten days later – on July 10, 2012 – Meltz expresses concern to Asch that he may have "pissed off" Van Hise by telling him "he [ha]s to be more careful if he wants to jump from fantasy to reality[.]" (GX 211 (July 10, 2012, 21:14:10 (UTC) to 21:14:19 (UTC))) Asch responds, "i hope not," but adds, "it's true though." (Id. at 21:14:50 (UTC)) Asch and Meltz then discuss the possibility of kidnapping and murdering a victim while Meltz's wife "Bonnie" is away:

moretime2read:     bonnie is still going way for a few days?

ruhmal2001:        yes we just need to be careful

| ruhmal2001: | yes but my only free day is Saturday she will go away for a long while in August |
|---|---|
| moretime2read: | oh good. if july doesn't work out, then maybe in august. |
| ruhmal2001: | absolutely |
| moretime2read: | i'll email mike and see what he's up to. he knows you have the 14th off? |
| ruhmal2001: | I think so |
| ruhmal2001: | not sure though |
| ruhmal2001: | gtg my wife just got home ttyl |
| moretime2read: | i'll let him know, but i don't know if it's worth trying to do the bitch he knows because of the electronic trail. ok. ttyl. |

(GX 213 (July 10, 2012, 21:59:26 (UTC) to 22:03:15 (UTC)))

On July 14, Van Hise emails to Meltz photographs of his sister-in-law, Sheri Davis, and her four children, ages one, three, five, and nine. (Tr. 394) The subject lines for the emails read: "sis in law" and "these are her four." (GX 214 (July 14, 2012, 12:40:01 -0700 (PDT)), GX 215 (July 14, 2012, 12:40:41 -0700 (PDT)))

On July 24 and July 25, 2012, Asch and Van Hise – using the alias "Michael S," an abbreviation for "Michael Santiago," one of Van Hise's usernames on DFN – again exchange emails about Van Hise's desire to kidnap and murder his sister-in-law:

| **Michael S:** | trying to still find someone to help me with my sis in law |
|---|---|
| **Chris Asch:** | well, it might still be possible to do something, but again, the main issue is your role and preventing you from being considered as a suspect. |
| **Michael S:** | i know that but at the same time i just really want her done even if you and rick have to abduct her and i copme there and rape her while you two strangle her thats fine |

(GX 216 (July 24, 2012, 09:49:17 -0700 to July 25, 2012, 15:04:51 -0700 (PDT)); see Tr. 64, 145)

At another point on July 25, 2012 – the same day Van Hise discusses kidnapping and murdering his sister-in-law with Asch – Van Hise emails Meltz about his interest in having Meltz murder his wife, Bolice Van Hise, who is Sheri Davis's sister. Van Hise explains in detail what he "want[s] beginning to end" for his wife:

> i would want you to go in as a repair guy. shell take you to the basement, once in the basemtnt you choke her out till she falls passed out. now that shes out you strip her of her shirt and if she has them on panties. now set up the noose and pull it down around her neck. now you pull your dick out maybe put it in her mouth if not you at least fondle her big breast and nipples, caress her legs and start fingering her. she wakes up moaning and you kiss her. she realizes whats going on and you jam her panties in her mouth before she can scream. now as she is looking terrified and trying to get up you pull the noose and she goes up on her tiptoes while shes like that you go behind her and say and now i should rape you you fucking cunt. you take her and start playing with her ass and shes freaking out than you put a vibrator in her or a bottle and start doing her with that. finally now that your finished with that youll go while she is crying and begging you pull down on the noose and have her swinging just inches abouve the ground and when her kicking slows you put the bucket under her for her to piss and shit in and watch the life drain from her eyes and maybe you go finger her some more before leaving knowing that ill be coming to see her soon and finding her like this will be a big turn on for me

(GX 217 (July 25, 2012, 10:59 a.m.))[11] Meltz replies, "[t]his can be done if you really desire it to be[.]" (Id. at 1:43 p.m.) Van Hise adds, "shes is also preg." (Id. at 15:18:19 -0700 (PDT)) Bolice Van Hise was, in fact, pregnant at the time of this conversation. (Tr. 1278)

The next day, Van Hise tells Asch that he and Meltz "were also talking about his wife and mine." (GX 220 (July 26, 2012, 10:02:54 -0700)) Asch replies, "if your wife and sister-in-law both disappear, i think that would be considered highly suspicious, and there could be a huge investigation. i assume your sister-in-law is your wife's sister?" (Id. (July 29, 2012, 06:08:24 -0700)) Van Hise responds, "yes and i have thought that too which is why i want to

---

[11]  Bolice Van Hise was living with her sister, Sheri Davis, during the summer of 2012. (Tr. 237) Davis testified that she lived in a nine-unit apartment building at that time. (Tr. 244)

grab only one preferably my sis in law but if cant ill take my wife[.]" (Id. (July 30, 2012, 06:08:24 -0700)) That same day, Van Hise again sends Meltz photographs of Sheri Davis's four children. (GX 219)

This email exchange between Asch and Van Hise then returns to Van Hise's wife Bolice. According to Van Hise, Bolice "is the only one that knows we dont get along[.]" (GX 241 (Aug. 2, 2012, 11:16:12 -0700 (PDT))) Van Hise states that he's "thinking more along the lines of my wife being raped and killed." (Id.) Asch replies, "that'd be better. you'd need to have an alibi, like being at work. what about the guilt, though? have you thought it through and will you feel any guilt if she disappears? what about her relationship with the kids? do they love each other and how will the kids feel?" (Id. at 2:22 p.m) Van Hise answers, "shes started to beat the kids and me im tired of her bitching i want her gone were even in the process of divorce also i have two ways id like her to go if your are interested i can send you pics and tell you more." (Id. at 11:23:59 -0700)

Van Hise does not send Asch a photograph of his wife. Instead, he sends a photograph of Sheri Davis. The subject line for this email reads "sister." (GX 241 (Aug. 2, 2012, 11:36:57 -0700)) A few minutes later Asch responds, "sounds like they both need to die." (Id. at 2:39 p.m.) Van Hise asks, "both as in who[?]," and Asch clarifies that he means Van Hise's "wife and its sister." (Id. at 11:40:58 -0700, 2:41 p.m.) Later in the conversation, Asch tells Van Hise, "i like rick's idea of posing as a repair man but if there's some other way to get her [i.e., Bolice Van Hise] alone somewhere, that might work. as far as the sister goes [i.e., Sheri Davis], what would be the best way to get her? home invasion or grabbing her some other way, like after work or going to the store?" (Id. at 2:50 p.m.) Van Hise replies, "after work i know

her job and there no security cams or officers also the home is best for my wife[.]"[12] (Id. at 11:52:36 -0700) Asch responds, "i'd like to fuck it and think it'd be fun if we could all rape it over and over if we were able to keep it at rick's house for a couple of days." (Id. at 2:55 p.m.) He continues, "i'd like to make that happen if we could. let's talk to rick and see what he thinks. if we could do it when his wife is away for a while, we might be able to pull it off." (Id. at 2:59 p.m.)

Later in their August 2, 2012 conversation, Van Hise asks if Asch wants to help him strangle Meltz's wife. (Id. at 12:00:32 -0700) Asch replies, "yes, i'm interested. this is quite a list of vics though. we'll have to spread them out." (Id. at 3:11 p.m.) Van Hise answers, "i know thats why i want at least the main one to be my wife." (Id. at 12:12:18 -0700) Asch responds, "ok, let's start with the wife." (Id. at 3:16 p.m.) Van Hise then repeats, verbatim, the "repair guy" scenario he described in his previous email to Meltz, in which he proposes killing his wife in "the basement." (Id. at 12:16:54 -0700) Asch replies, "that sounds very hot, especially fin[d]ing her hung, if that's what you'd like to do." (Id. at 3:21 p.m.)

In a separate August 2, 2012 email thread bearing the subject line "how i want her hanged," Van Hise explains that his wife has tried to commit suicide on several occasions. Asch asks, "has she been seen by a psychologist or anyone who could testify to her mental state?" Van Hise replies that she is "certified crazy by one psychiatrist." (GX 224 (Aug. 2, 2012, 12:24:51 -0700 to 3:29 p.m.)) Asch comments, "that helps." (Id. at 3:35 p.m.) At trial, Sheri Davis confirmed that a psychiatrist had diagnosed her sister Bolice with a mental disorder, and that she had attempted suicide.[13] (Tr. 237)

---

[12] Sheri Davis testified that she was not employed during the summer of 2012. (Tr. 247)

[13] Bolice Van Hise was called as a defense witness at trial. On direct examination, she testified that – during her marriage to Van Hise – she had not seen a psychologist, had not been suicidal,

18

On August 16, 2012, Van Hise writes to Asch, "please get back to me." (GX 241 (Aug. 16, 2012, 13:01:07 -0700)) Asch responds by asking Van Hise what his "ideas" are "for doing them at this point?" (Id. at 4:33 p.m.) Van Hise explains, "separate the sisters or knock one out and start with the other after tieing her up[,] or do one while the other isnt home[,] and the kids we could take in one room and start tieing up while the other one of us is starting with the sisters." (Id. at 13:35:55 -0700) Asch responds, "i think your original idea about hanging the wife to make it look like a suicide makes sense. if we do them all at once, it will generate a huge amount of publicity." (Id. at 4:38 p.m.) Van Hise asks how they can "do the wife in a suicide where it will lok real now that shes living [with his sister-in-law?]" (Id. at 13:39:17 -0700) The two men then discuss "doing" Van Hise's wife at her mother's home, which is "where she originally tried to kill herself by hanging." (Id.) Asch suggests, "why don't you talk to rick and see what he thinks now that the circumstances have changed[?]" (Id. at 4:47 p.m.) Van Hise explains that he hasn't "been able to get [Rick] online [because his] wife had surgery[.]" (Id. at 13:48:01 -0700) Later in their exchange, Asch asks, "so, if the wife is hanged do you think you'd [get] custody of the kids?" (Id. at 5:18 p.m.) Van Hise responds, "for sure yes," and adds, "do you want some more pics of her[?]" (Id. at 14:18:42 -0700) Van Hise then emails another photograph of Bolice Van Hise to Asch. (GX 235 (Aug. 16, 2012, 14:20:33 -0700 (PDT)))

---

and had not taken psychiatric medication. (Tr. 1251) On cross-examination, however, Mrs. Van Hise acknowledged that she had been diagnosed with depression and had attempted suicide when she was nine-years-old, after the death of her father. (Tr. 1279-80)

Because Van Hise moved for a judgment of acquittal at the close of the Government's case pursuant to Fed. R. Crim. P. 29(a), this Court may not consider evidence presented during the defense case in determining whether to grant Van Hise's Rule 29(a) motion. See Fed. R. Crim. P. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."). Accordingly, the Court has not considered Bolice Van Hise's testimony or any other evidence introduced after the close of the Government's case in resolving the Defendants' Rule 29(a) motions. This evidence is, of course, relevant in connection with the Defendants' new trial motions under Fed. R. Crim. P. 33.

On August 28, 2012, Van Hise has an email exchange with an individual using the screen name "D N" and email address "gboroguy81@yahoo.com," in which the two discuss Van Hise's desire to murder his wife, sister-in-law, and four nieces. During the exchange, D N asks Van Hise, "So tell me, are you really serious about doing it or just playing. I'm enjoying fantasizing about it, but that's about it." (GX 245 (Aug. 28, 2012, 1:19 p.m.)) Van Hise responds, "did you getthe message i am very serious about this no fantasy i want reality[.]" (Id. at 1:34 p.m.) D N then expresses his concern that "this is some sort of sting operation," to which Van Hise replies, "no trust me[,] I want this bitch dead and gone im tired of her shit shes a bitch i want her raped tortured and hanged so are you interested for real?" (Id. at 1:47 p.m.) D N responds, "Don't get me wrong, it would be fun. But honestly, it would be difficult to get rid of 6 people, let alone 1. Too much could go wrong. But it would be fun." (Id. at 2:53 p.m.) Van Hise replies, "k so how about justthe wife would you help me with her shes the main one i want anyway." (Id. at 11:53:58 -0700 (PDT))

On August 31, 2012, Van Hise once again sends photographs of Bolice Van Hise, Sheri Davis, and Davis's four children to Meltz. (GX 246-248) A few days later, Van Hise and Asch exchange more ideas about killing Bolice Van Hise. Asch proposes that they bring Bolice to Meltz's house, where the men would "restrain her in his basement and have our fun with her." (GX 252 (Sept. 4, 2012, 3:55 p.m.)) Asch notes that he's been in Meltz's basement, but "do[es]n't remember if [Meltz] has stuff to tie someone up to," although he's "sure there are pipes or posts to use." (Id.) Van Hise writes that he does not want his wife "tied to anything," because he "want[s] her to roll and struggle as we rape and use her." (Id. at 4:08 p.m.) Asch responds that "if we leave her free there's added risk that she could scratch or kick one of us. i think it would be better to lower the risk to us in every way so there's no chance she could hurt

us." (Id. at 4:14 p.m.)  The two men then discuss how they would like to rape and murder Bolice

Van Hise.  Towards the end of their conversation, Asch asks Van Hise whether he would like

"the honor" of "hanging her," and Van Hise replies, "sure and the honor of raping her as she

hangs[.]"  (Id. 4:20 p.m. to 4:21 p.m.)

      The next day, September 5, 2012, Asch – using the email address

"moretime2read" and Meltz – using the email address ruhmal2001 – engage in an electronic chat

in which they discuss, inter alia, the possibility of murdering either Meltz or Van Hise's wife:

| | |
|---|---|
| **moretime2read:** | hey rick, how are you? |
| **ruhmal2001:** | ok Chris how are you doing? |
| **moretime2read:** | ok thanks.  i heard from mike that your wife had surgery. |
| **ruhmal2001:** | yes she is ok home resting now |

*    *    *    *

| | |
|---|---|
| **moretime2read:** | mike asked me if he an i should do it [i.e., murder Meltz's wife] together.  i told him i thought we should wait until her parents die as they would consider you a suspect. . . . |

*    *    *    *

| | |
|---|---|
| **ruhmal2001:** | Mike has nice ideas for fantasy but I fear he has too many conditions attached in how he wants hios wife hung |
| **moretime2read:** | true.  mike wants to bring his wife to your house.  trying to keep him grounded and focused on the practical details. . . . yes he wants it to go a certain way.  we may not have that luxury.  might be better until your wife is better and takes an extended trip to fla. |
| **ruhmal2001:** | I told Mike to foind me a female or passable trannie to strangle my wife and I would help him he has not gotten back to me yet |
| **ruhmal2001:** | My wife may take an extended trip to my daughter's home in Boston that would make all things possible |

*    *    *    *

| | |
|---|---|
| **ruhmal2001:** | if she goesw we can do Mike's bidding |
| **moretime2read:** | i see. when do you think that might be? |
| **ruhmal2011:** | Oct 10 or sometime after for a few weeks at least |
| **moretime2read:** | that'd be great. |
| **ruhmal2001:** | yes it would be. |

*     *     *     *

| | |
|---|---|
| **ruhmal2001:** | we can get her on a Friday and keep her into Sunday |
| **moretime2read:** | mike's wife? |
| **ruhmal2001:** | yes |

(GX 250 (Sept. 5, 2012, 22:25:30 (UTC) to 22:26:30 (UTC); 22:29:20 (UTC); 22:30:26 (UTC) to 22:32:17 (UTC); 22:34:22 (UTC) to 22:35:56 (UTC); 22:36:26 (UTC) to 22:37:17 (UTC)))

Two days later, on September 7, 2012, Asch writes to Van Hise, "i chatted with rick, and [h]is wife may be going to boston for a while to recuperate, so he may have free time, when we could do your wife." (GX 252, Sept. 7, 2012, 2:31 p.m.) Van Hise replies, "great awesome and can you be on[line] monday after 945 am[?]" (Id. at 19:12:17 -0700 (PDT))

A little over a month later, on October 11, 2012, Van Hise suggests new ideas for kidnapping and murdering his wife. He explains that Asch could pose as a lawyer who "needs to talk to her about the car accident papers from last year that she has to sign." (GX 259 (Oct. 11, 2012, 10:57:06 -0700)) The following day, Van Hise proposes another plan, in which Van Hise would assume a fake Internet identity and offer his wife money for sex, "so she can get the kids stuff they need." (Id. (Oct. 12, 2012, 11:27:14 -0700)) After she arrives at a pre-arranged location, Asch and Van Hise can "strangle her out than tie her up." (Id.) When Asch asks where this will take place, Van Hise responds "near her sisters [. . .] in trenton near eisenhower." (Id. at

2:30 p.m., 11:33:18 -0700)  At trial, Sheri Davis confirmed that she lives on Eisenhower Avenue

in Trenton, New Jersey.  (Tr. 231)

In an October 22, 2012 email to Van Hise, Asch explains,

i spoke to rick today and he has this Friday, oct. 26 free and wanted to look for a
bitch to do in.  i reminded him about your wife and wondered if you thought it
might be possible to do something with all three of us.  either hanging her and
making it look like a suicide or strangling her with our hands.  let me know what
you think and also, please get in touch with him to discuss whether it might be
possible.  if it's not, thats ok, he still wants to go hunting for cunt and you're
invited.

(GX 261 (Oct. 22, 2012, 21:07:56 -0400))

The next day, during an electronic chat, Asch and Meltz discuss Van Hise's desire

to murder his wife, and their willingness to assist Van Hise in committing the murder:

| | |
|---|---|
| **moretime2read:** | have you heard from mike?  he still wants to do his wife. |
| | *        *        *        * |
| **ruhmal2001:** | he wants to do his wife and his sister in law and who knows who else and still not be [a] suspect |
| **ruhmal2001:** | he is not in the real world |
| **moretime2read:** | ok.  he still is thinking about different ways to do her.  i know.  maybe we should invite him along so he can see how to keep grounded. |
| **ruhmal2001:** | I would welcome his company |
| **ruhmal2001:** | we can even go to him if he desires |
| **moretime2read:** | he thinks she will respond to an offer of money.  he also has a new car that she doesn't know about, and if someone else is in it other than him, she might do it. |
| **ruhmal2001:** | strangle his wife together |
| **ruhmal2001:** | imagine the 3 of us choking her? |
| **moretime2read:** | we could do that.  if he could communicate with her non-ele[c]tronically and lure her with an offer of money for sex |

with someone in a car she doesn't know, it could work. i
would love to have the three of us do her.

(GX 262 (Oct. 23, 2012, 00:15:09 (UTC); 00:16:13 (UTC) to 00:21:11 (UTC)))

### D. Events Following Valle's Arrest and the Introduction of an Undercover Agent

On October 24, 2012, FBI agents arrested Gilberto Valle, with whom Van Hise had been communicating about kidnapping, raping, and murdering a woman named Alisa Friscia. Valle, 301 F.R.D. at 66-67. Two days later, on October 26, 2012 – the same day Asch had proposed for kidnapping Bolice Van Hise – FBI agents executed a search warrant at Van Hise's grandparents' home. (Tr. 81) Van Hise and his grandmother returned to the home while the search was ongoing. (Tr. 306)

As discussed above, Van Hise gave a statement to FBI agents on October 26, 2012, in which he admitted being in contact with an individual whom he believed was actively looking to rape and kill a real woman. (Tr. 63-65) Between October 26, 2012, and January 4, 2013, Van Hise cooperated with the FBI, meeting on numerous occasions with FBI agents. During this time, the FBI obtained search warrants for Van Hise's email accounts. (Tr. 66) The FBI also attempted – without success – to corroborate Van Hise's claim "that the reason he was seeking out the people [on DFN who] were most serious about acting on their fantasies or those that had already done it was because he wanted to take that information and provide it to law enforcement and had already approached law enforcement [with that information]." (Tr. 110) At trial, officers of the Hamilton and Trenton, New Jersey police departments testified that Van Hise had not, in fact, reported any of his online activities to them. (Tr. 126-32) The FBI's inability to corroborate Van Hise's claim led agents to "believe that he wasn't being truthful." (Id.)

24

In November 2012, Asch conducted Internet research into kidnapping methods, including how to "'make sleeping powder'" (Tr. 998-99; GX 11-2), buy chloroform (Tr. 999; GX 1104), and "'make sleeping gas'" (Tr. 999; GX 1106). (See also GX 1101, 1103, 1105, 1107-1111) Asch also researched and downloaded a computer program designed to disguise and render untraceable his Internet communications and browsing history. (Tr. 992-94)

In mid-December 2012, shortly before Van Hise's arrest, FBI Special Agent Aaron Spivack – with Van Hise's consent – assumed control over one of Van Hise's email accounts. Agent Spivack used Van Hise's email account to have Van Hise "introduce" Asch to Agent Spivack's undercover persona – "Darren Watson." Darren – purportedly a friend of Van Hise – posed as someone who was interested in kidnapping, raping, and murdering women. (Tr. 431-33) Asch and "Darren" began communicating frequently over the DFN website, and Darren soon provided Asch with an email address. (Tr. 434)

Van Hise was arrested on January 4, 2013. (Tr. 79) As discussed above, in a post-arrest statement Van Hise told agents that he "was serious about kidnapping, raping and killing a woman," and that his "sexual desires" provided the motivation for his conduct. (Tr. 72) The jury heard evidence that Van Hise told agents that he had met with "another individual" in Trenton concerning a kidnapping, and that that individual said that he "took a train from Manhattan to Trenton" for the meeting. Van Hise also told agents that he "drove the two of them around the town, and that they looked at women and discussed different ways that they could rape and kill those women." (Id.)

On January 5, 2013, the day after Van Hise's arrest, Asch emailed Darren for the first time:

hi darren,

could you call me as soon as you can? it's urgent. <u>212 242-8407</u>. it's a little after midnight, sat., jan. 5. if you don't get this tonight, please try to call tomorrow.

thanks,
chris

(GX 802 (Jan. 5, 2013, 12:15 a.m.))

After exchanging emails, Asch and Darren eventually spoke by telephone on the afternoon of January 5, 2013. In their conversation – which the FBI recorded – Asch refers to "the news" of Van Hise's publicly reported arrest. (Tr. 439-40) Asch tells Darren that he and Van Hise had

an exchange of emails a while back and I said, you know, um, look, I you want to do some of these things, you can't be communicating by, you know, online, because you know, it's all traceable and stuff, and uh, part of it was just, you know, he couldn't afford to have his own phone and so forth, so this is how he was doing it, but, I don't think he fully got the fact that, you know, you leave an electronic trail, you known, whenever you're online [. . . .]

(GX 361-T (Jan. 5, 2013, 2:00:05 p.m.) at 1)

Darren asks whether Valle or Van Hise's arrest poses any risk to Asch. Asch indicates that he is not worried about Valle's arrest, but that Van Hise's arrest gives him concern, because of the content of his email communications with Van Hise:

[DARREN]: . . . did you at all talk about the cop thing. I mean, there's not any concern on your part, is there?

[ASCH]: Well, not with the cop. I don't believe I've ever spoken to him. I mean, I know what his user name was or anything, um, you know, it's more the conversations with Mike and those emails and stuff and the fact, you know, if they want to like, pull in other people and stuff, and make this like, a huge case, they could because you know, we had pretty frank conversations about actually doing stuff to his wife.

[. . . .]

[. . .] just a while ago, I mean, it may be even between October and now, you know, we were discussing stuff about his wife, and he wanted to, you know, he had all these different scenarios and so forth, and uh, but, you know, in Mike's fashion, he just didn't seem to have all the details, you

know, worked out, like how are you gonna get somebody out of a house without being seen, and how are you gonna you know, subdue them, and all this kind of stuff, so, you know, we went through a lot of different scenarios through emails about how this might actually [occur].

(Id. at 2-3)

Darren then asks Asch whether – given that Van Hise's "details . . . needed work"

– he believed that Van Hise was "serious." Asch responds as follows:

I think he's pretty serious. I think, um, I just, maybe, and I hate to be ageist, I think, you know, but I thought [. . .] some of it was because he was pretty young, and you know, but I just thought, too, you know, you really need to be more savvy about stuff like leaving an electronic trail, I mean, that seemed to fully escape him, you know. He seemed to think he could get rid of his computer if he needed to, and blah, blah, blah, and um, I just didn't think he was completely, you know, dealing in reality there, but um, I think, no, I think he was kind of serious, I just think he was short on the planning, you know, I mean uh, and how um, things would unfold, and how, you know, planning for contingencies and stuff, for stuff to go wrong, because it surely would, you know, I mean.

(Id. at 3)

Later in their telephone conversation, Asch discusses his concerns about Van

Hise's "impatience":

Well, see the things, I, this is, his impatience, and I told him, you know, you've got to slow down. [. . .] I know he was chomping at the bit, you know, at one point. This is why we had this exchange of emails about you know, doing something to his wife, and I'm sure that he thinks that people are kind of um, you know, full of nonsense, but um, but it's also a matter of being safe and circumstances being right and all that – [a]nd uh, he was just, you know, I think he seemed reckless enough that he just wanted to do something, and then, you know, at one point, he wanted to do his whole family, and I'm thinking, you know, Mike, you know, it's like, what are you thinking? I mean, you could maybe do one person, you know. [. . .] Um, it's just, um, and you'd be the prime suspect [. . . . ]

(Id. at 6)

Notwithstanding his concerns about the arrest of Van Hise, Asch agreed to meet

with Darren to discuss a potential kidnapping. The meetings and electronic communications

27

discussed below form the basis for Count Two of the S4 Indictment – the Asch/Meltz conspiracy

to kidnap a female FBI undercover agent.

## III. THE ASCH/MELTZ CONSPIRACY TO KIDNAP A FEMALE UNDERCOVER AGENT

### A. Asch's Initial Contact with an Undercover Agent

The first meeting between Asch and Darren took place on January 7, 2013, at the

South Street Seaport in lower Manhattan. According to Agent Spivack, during the meeting Asch

> told [Darren] that he had met Mr. Van Hise in person, in Trenton, New Jersey.
> That they had driven around in an area where Mr. Van Hise wanted to dump a
> body. Mr. Asch told me that he actually told Mike, or Mr. Van Hise, that he
> didn't think that was a suitable location, given it's close proximity to the
> population. And he was afraid that if they tried to dump a body there, somebody
> would find it. He told me that Mr. Van Hise wanted to kill his wife, and that his
> wife was suicidal, so if they killed her, they could make it look like it was a
> suicide.

(Tr. 448-49)

Asch and Darren also discussed Asch's relationship with Meltz:

> We discussed that, first, that Mr. Asch and Mr. Meltz had met in person. That
> Mr. Asch spent time with Mr. Meltz. That Mr. Meltz was a retired police officer.
> That he was currently working at a VA Hospital in Massachusetts. And I think
> Mr. Asch thought at the time he was a security guard. He was concerned – not
> concerned. I guess he did indicate that Mr. Meltz had weapons due to his
> association with the Police Department. And he told me that Mr. Meltz had
> committed, I think, two murders, he stated, in the past, where he strangled women
> in his basement.
>
> . . . .
>
> Mr. Asch told me that Mr. Meltz was surprised when Mr. Asch actually showed
> up for their in-person meeting, and that Mr. Asch was only one of two or three
> that Mr. Meltz had ever actually met in person of many that -- they tried to meet
> up, but only a couple actually did show up.

(Tr. 449-50)

During this conversation, Asch expressed an interest in targeting women

attending the Puerto Rican Day parade in New York City:

discussed below form the basis for Count Two of the S4 Indictment – the Asch/Meltz conspiracy

to kidnap a female FBI undercover agent.

## III.    THE ASCH/MELTZ CONSPIRACY TO
## KIDNAP A FEMALE UNDERCOVER AGENT

### A.    Asch's Contact with Undercover Agents

The first meeting between Asch and Darren took place on January 7, 2013, at the

South Street Seaport in lower Manhattan.  According to Agent Spivack, during the meeting Asch

> told [Darren] that he had met Mr. Van Hise in person, in Trenton, New Jersey.
> That they had driven around in an area where Mr. Van Hise wanted to dump a
> body.  Mr. Asch told me that he actually told Mike, or Mr. Van Hise, that he
> didn't think that was a suitable location, given it's close proximity to the
> population.  And he was afraid that if they tried to dump a body there, somebody
> would find it.  He told me that Mr. Van Hise wanted to kill his wife, and that his
> wife was suicidal, so if they killed her, they could make it look like it was a
> suicide.

(Tr. 448-49)

Asch and Darren also discussed Asch's relationship with Meltz:

> We discussed that, first, that Mr. Asch and Mr. Meltz had met in person.  That
> Mr. Asch spent time with Mr. Meltz.  That Mr. Meltz was a retired police officer.
> That he was currently working at a VA Hospital in Massachusetts.  And I think
> Mr. Asch thought at the time he was a security guard.  He was concerned – not
> concerned.  I guess he did indicate that Mr. Meltz had weapons due to his
> association with the Police Department.  And he told me that Mr. Meltz had
> committed, I think, two murders, he stated, in the past, where he strangled women
> in his basement.
>
> . . . .
>
> Mr. Asch told me that Mr. Meltz was surprised when Mr. Asch actually showed
> up for their in-person meeting, and that Mr. Asch was only one of two or three
> that Mr. Meltz had ever actually met in person of many that -- they tried to meet
> up, but only a couple actually did show up.

(Tr. 449-50)

During this conversation, Asch expressed an interest in targeting women

attending the Puerto Rican Day parade in New York City:

> Mr. Asch brought up his desire, or his I guess interest, in targeting a victim at a parade in New York. He specifically mentioned the Puerto Rican Day Parade. And stated that hundreds of thousands of people attend these parades, that they get really, really drunk. And at the end of the parade they go down to The Village where they continued to drink. And he thought that targeting a victim there would be best, because they would be drunk, potentially they would pass out at the bar, continue to get them drunk, to pass out, and that they would make a good victim.

(Tr. 450)

The two men also discussed various methods for incapacitating a female victim, and how to transport the victim out of New York City without detection:

> Mr. Asch brought up a number of concerns about if you abduct someone in the City, how do you get them out of the city without going through a camera somewhere, whether it is at a toll booth or something. License plate readers I think were discussed, things like that. So we actually discussed the various ways to get in and out of New York. And even talked about, well, the best way would, I guess, be to go through Queens, and like the 59th Street Bridge because there was no toll booth.
>
> . . . .
>
> [We] [t]alked a little bit about roofies, he mentioned that he had used them before. He talked about a sleeping drug. And I believe he was referring to Ambien. . . . And he said he had been taking Ambien for his own personal use. And he actually joked about going to his doctor to – or part of a doctor's visit, he asked the doctor how much of the drug would be required to get somebody to pass out.

(Tr. 451-52)

Asch made it clear to Darren that he

> did not want to execute a kidnapping alone. He was pretty adamant that the risk factor was too great, and he wanted to do it with a group. He felt that the more people that were participating, there were more people to watch each other's backs and to prevent slip-ups from happening.

(Tr. 452)

Asch told Darren that he had thought about kidnapping a woman "for many, many years," but that he wanted "the circumstances to be right before he did anything," and that he was "concerned about going to jail, which was one of the reasons he . . . may not have done

29

"something" previously.  (Tr. 453)  Asch also stated that he had discussed committing

kidnappings with several other men, including Meltz.  (Tr. 452-53)  Asch requested that he and

Darren communicate by telephone, because Asch believed it was "safer" than email.  (Tr. 454)

During the January 7, 2013 meeting, Darren told Asch that "Joe" – a purported

friend from the Marine Corps – might also be interested in participating in a kidnapping of a

woman.  (Tr. 453-54, 463)

Asch and Darren met again on January 18, 2013.  (Tr. 466; GX 501 (surveillance

photo))  During this meeting – which was recorded by the FBI – Asch and Darren again

discussed the plot to kidnap and murder Van Hise's wife and sister-in-law.  (GX 352-T (Jan. 18,

2013) at 1)  Asch told Darren that Van Hise's wife was "suicidal," and that he and Van Hise had

talked about "choking her out before hanging her [. . .] making it look like a suicide."  (Id.)  Asch

noted that Van Hise and his wife "were on and off and lately she [had] moved out and moved in

with her mother."  (Id.)

Asch also described his in-person meeting with Van Hise in Trenton, when Van

Hise had shown Asch a bar that "he thought would be good [to . . .] pick up a hooker," and an

alley and park that Van Hise thought would be a "good dumping ground."  (Id. at 1-2)  Asch told

Darren that neither the alley nor the park was an appropriate place to dump a body, and said that

he had told Van Hise that "you need to go to the mountains or something."  (Id. at 2)  Asch

expressed concern that Van Hise did not have "both feet on the ground."  (Id.)  Asch explained

that, when speaking with Van Hise, he

> usually insisted [. . .] that [Van Hise] try and talk to Rick, you know[,] because
> Rick claimed some experience and[,] you know[,] I believe him and uhm he
> needed to talk to somebody like that [. . . .]

(Id.)

In response to Darren's questions about why Asch had never "d[one] anything,"

Asch replied:

> I think because the circumstances were never really right for me, I also [ . . . ]
> would prefer doing it with somebody like Joe or Rick you know who's, you
> know[,] have some experience . . . and uhm you know but think about all the
> contingencies, and things that might go wrong, and things with, practical stuff,
> you know what I mean, how do you dispose (UI [unintelligible]) . . . all that stuff,
> I mean where do you keep them uh . . . you know what I mean, (UI) at this point I
> know what [Rick's] fantasies are and what he likes, I mean ideally he would like
> to be able to keep something too for a long time . . . to be able to you know to like
> torture repeatedly, raping repeatedly . . . and then you know, and that's, that
> would be my ideal to have somebody somewhere that we could uhm go out on the
> weekend and ya know, something, you know and after a while after we've made it
> useless from all the abuse and stuff you know you decide to snuff it and then uhm
> get rid of it and uh move on to the next one (laugh) . . . [.]

(Id. at 5)

As to the age of a potential victim, Asch told Darren that he did not "have any

boundaries in terms of that . . . I can go as low as we want it to go." (Id. at 6) Asch went on to

express a strong interest in raping infants. (Id. at 6-7)

During the January 18, 2013 meeting, Darren questions Asch about whether he

and Meltz would "be comfortable going to the next level":

| Darren: | Would you and Rick be comfortable going to the next level? |
| Asch: | Oh sure . . . |
| Darren: | Because this (UI) . . . is no joke[,] ya know? |
| Asch: | Yeah, yeah . . . |
| [. . . .] | |
| Asch: | Yeah . . . no absolutely, I, it took me a long time to get to this place I think uhm it took me many years to think about you know how would I react if I felt guilty, Rick said he felt guilty the first time, but he was a kid, he was a teenager. |
| Darren: | How'd he deal with that? |

| Asch: | I guess he just, you know he kind of thought about it and rationalized it somehow and got over it . . . uhm to the point where you just you know was able to do . . . . |
| --- | --- |
| Darren: | Do it again . . . |
| Asch: | A lot of them . . . yeah . . . over the years . . . |
| Darren: | But do you think, you said you['ve] never done this before . . . |
| Asch: | You know I don't think you really ever know until you do it. |
| Darren: | I know . . . I know that feeling. |
| Asch: | But I think I'm, I think I'm comfortable enough uhm you know to, I think, I'm quite certain that I could because uhm and not really suffering the guilt. |

(Id. at 4)

Several additional in-person meetings and recorded telephone conversations between Asch and Darren took place in January, February, and March 2013. At a February 15, 2013 meeting, Darren introduced Asch to "Joe," another undercover FBI agent. "Joe" had purportedly met Darren in the Marine Corps, and the two had served together in Iraq. (Tr. 492) Darren told Asch that Joe was also interested in kidnapping and murdering women. (Tr. 453-54) The two undercover agents proposed to Asch that they target the ex-wife of Joe's friend, who was "a real bitch and took uh everything when they divorced." (Tr. 493-94; GX 402-T (Feb. 22, 2013 18:50:54 EST) at 2; GX 701-A (photograph of female undercover agent); see GX 401-T (Jan. 22, 2013 18:31:21 EST) at 1) The agents provided Asch with a photograph of the proposed victim, and Asch said that "she was pretty, petite, and that he liked her." (Tr. 494) At Asch's

request, they allowed him to keep the photograph. (Id.) Unbeknownst to Asch, the woman shown in the photograph was an undercover FBI agent.[14]

On March 13, 2013, Darren, Joe, and Asch met at a coffee shop in lower Manhattan, to further discuss the kidnapping of the female undercover agent and surveillance of her. (Tr. 503-04, GX 355) The meeting took place "near the financial district[,] near where [the agents] said the victim worked." (Tr. 504) The agents observed that Asch had brought a white shopping bag to the meeting, but did not know what was inside the bag. (Tr. 506) The three men observed the female undercover agent come out of a nearby building; after observing the undercover agent exit the building, Asch remarked, "she deserves to die." (Tr. 506-07) The three then walked to a Starbucks store in the neighborhood. (Id. at 507)

At Starbucks, the three men discussed how to "incapacitate the victim . . . , how to get her into our van and away from where we were at." (Id. at 508) The agents showed Asch a number of surveillance photographs. (Tr. 531-533) The photos showed the female undercover agent, her purported residence, a nearby alley and parking lot, and the Path station she arrived at each morning on her way to work. (Id.; GX 531, 532) Inside Starbucks, Asch showed the agents what was contained in the white shopping bag he had brought to the meeting. (Tr. 534; GX 504-506 (surveillance photographs of Asch with white bag))

---

[14] Agent Spivack testified that the decision to suggest a potential victim to Asch was driven by a desire to

try and control the situation. The concern that we had was that I was gonna get a phone call in the middle of the night from either Rick [Meltz] or Chris [Asch] stating that they had somebody, they found some drunk girl at a bar and they were ready to move. And that was a risk we couldn't take. So the objective, now, by saying we have a victim, is to try and get him focused on our plan -- not our plan, but our -- to get him focused away from the idea of a drunk girl at a bar.

(Tr. 491)

Asch's white bag contained, <u>inter alia</u>, "various maps of . . . the greater New York area," manila folders containing a document entitled "Construction Materials" and a list of guns shows in Pennsylvania, and literature regarding sexual torture devices. (Tr. 534-35, 537-38; GX 603A-603E)

Asch told the agents that the Construction Materials document was

a list of things that he thought we needed in order to conduct this kidnapping, torture, and kill[ing] of the victim. He listed it in the several categories. The first category is building. It says we need heavy rope, clothesline, wire, duct tape, alligator clamps, board clamps, hammer, nails, mouse traps, spreader bars, stocks, nail gun and charger, electric stapler, cable ties, lag bolts, S hooks, sandpaper, hacksaw, C clamps, vi[s]e and lumber.

He provides the next category as cleaning. He says that we need bleach, ammonia, scrub brushes, mop, sponges, garbage bags, paper towels.

He identified the next category for us as medical. And he stated that we need rubbing alcohol, hydrogen peroxide, needles, forceps, sleeping medications, tweezers, dental device, . . . vinyl examination gloves, scissors, cardiac medication, piercings, tattoos.

The next column category is cooking. And he stated that we need skewers, matches, meat tenderizer, knives.

The next category's documentation. He stated that we needed a or could have used a camera or video camera.

Next category was clothing. References stockings, ski masks, cuffs, gloves, riding gear, needles hatpins.

Followed by landscaping which he says we need an axe and a spade.

The next category's transportation. Car/van, phones, routes, tolls.

(Tr. 535-36; GX 603B)[15]

---

[15] Asch told the agents that he had entitled the document "Construction Materials" so that, in the event anyone ever found the document on his computer, the list would appear to be "something innocuous, like [a] construction material document." (Tr. 535)

In addition to the "Construction Materials" document, Asch provided the undercover agents with a calendar of upcoming gun shows in Pennsylvania (GX 603C), and literature regarding sex-related torture devices, including a "leg-spreader" (GX 603E), and a "dental retractor."[16] (GX 603D).

Asch's shopping bag also contained a leather whip; doxepin hydrochloride, an anti-psychotic drug that is commonly used as a sleep agent; clamps and alligator clips to be used as sexual torture devices; framing nails; leather straps; a black ski mask; a vise wrench; a hammer; pins, needles, and syringes; and handcuffs. (Tr. 539, 544-52; GX 603, 603A-603Z) Asch explained that he brought these items to the meeting because "it would be easier for us to store items at [Joe's] house ahead of time," "so that when we grab the victim, we didn't have any loose ends." (Tr. 553, 555-56) The agents had not asked Asch to purchase any of these items, or to bring them to the meeting. (Tr. 550-52, 544-48)

**B.**     **Meltz's Involvement in the Asch/Meltz Conspiracy**

In early March 2013, Asch told Darren that Meltz was also interested in participating in the kidnapping of the female undercover agent. Asch provided Darren with Meltz's telephone number, and in a March 6, 2013 telephone call, Meltz and Darren discussed the kidnapping of the female undercover agent. (Tr. 499-500) A wiretap installed on Asch's home telephone in February 2013 captured numerous telephone conversations between Asch and

---

[16] The dental retractor "printout" showed

> a woman on her knees partially nude with this device in her mouth, which appears to be spreading her mouth open. And we talked about this device. This was something he had indicated he was interested in because he could keep the victim's mouth open without preventing her from chewing – I guess closing her mouth, because he wanted to insert body parts into her mouth and choke her.

(Tr. 538)

Meltz in which they discuss the kidnapping and murder of women, including the planned kidnapping, rape, torture, and murder of the female undercover agent. (GX 401-402, 404-406, 409, 412-413, 415, 418)

During a March 3, 2013 telephone conversation, for example, Asch and Meltz discussed at length how a taser would be useful in effecting a kidnapping. (GX 404) Meltz suggested that Asch purchase a taser at a gun show in Pennsylvania. Meltz also offered to visit gun stores in New Hampshire to determine what types of tasers were available for purchase. (Id.)

On April 6, 2013, FBI agents followed Asch from Manhattan to a gun show in Allentown, Pennsylvania, at which he purchased a taser. (Tr. 813-14, 820-21; GX 523 (surveillance video)) In a telephone call the next day, Asch told Darren that he had purchased a taser at a Pennsylvania gun show. (GX 319)

More conversations between Meltz and Darren follow, in which the two men discuss the kidnapping and murder of the female undercover agent. (See Tr. 574-75) By April 14, 2013, Darren had spoken by telephone with Meltz on approximately eight occasions about the plan to kidnap the female FBI undercover agent. (See Tr. 572, 574)

C.     **Meltz's April 14, 2013 Meeting with an
       Undercover Agent and Subsequent Arrest**

On April 14, 2013, Meltz and Darren met at a Buffalo Wild Wings restaurant in New Jersey. (Tr. 574-75) During the meeting, Meltz expressed interest in having Darren murder his wife, and the two "talked extensively about how that could happen, various scenarios." (Tr. 575) Meltz and Darren also discussed the plot to kidnap the female undercover agent. Darren showed Meltz a photograph of the proposed victim, and "told [Meltz] that this was the girl that we were going to kidnap and kill." (Id.) Meltz offered advice on, inter alia, methods for

36

avoiding detection and disposing of the female undercover agent's body. (Tr. 575-76) During

this conversation, Meltz discussed the fact that Asch had purchased a stun gun to use in the

kidnapping. (Tr. 576; see GX 357) Meltz was arrested at the conclusion of the meeting. (Tr.

1068)

Agent Spivack testified that – during the April 14, 2013 meeting with Meltz – he

"asked Mr. Meltz outright if he thought Mr. Asch was serious about this and would go through

with this plan[,] and Mr. Meltz stated that he [wa]s." (Tr. 576, 774) Although the meeting

between Meltz and Agent Spivack had been recorded – in both an audio-only format and in an

audio-video format (GX 357; see Tr. 1064-68) – the Government did not introduce these

recordings during its direct examination of Agent Spivack.

In his cross-examination of Agent Spivack, Asch's counsel challenged Agent

Spivack's testimony that Meltz had stated that Asch "would go through with it." (Tr. 775)

When defense counsel sought to introduce the Government's audio recording of the April 14,

2013 meeting (GX 357) during his cross-examination of Agent Spivack, however, the

Government objected:

> With respect to the line of questioning that Mr. Waller is engaging in right now,
> it's the government's understanding that he intended to attempt to impeach Agent
> Spivack with a recording. We don't believe that the underlying recording is
> admissible. So while he can ask Agent Spivack about the statement and attempt
> to impeach him that way, we don't believe the underlying recording should be
> played in front of the jury. There are a number of reasons for this including the
> fact that one of the issues with the recording is [that] the FBI believes it says one
> thing and the defense believes it says another. So we think that it's confusing,
> quite frankly. The quality of the audio [is] not very high. Additionally, Agent
> Spivack has a clear memory of this and so therefore his memory should control.

(Tr. 778) The Government also argued that the audio recording should not be played because

"Mr. Meltz's state of mind [is] not probative with respect to Mr. Asch's state of mind. Mr. Asch

is the defendant on trial. Mr. Meltz has pled guilty here." (Tr. 784)

This Court rejected both arguments. (Tr. 778, 784-85)  With respect to the

Government's first argument, the Court explained, "obviously, [Agent Spivack's] memory

doesn't control.  There's a tape."  (Tr. 778)  As to the Government's contention that Meltz's state

of mind was not probative as to Asch's state of mind, the Court noted that

> the jury has to find here that not just [ ] Mr. Asch intended to participate in the
> conspiracy to commit kidnapping[,] but that Mr. Meltz did as well.  And part of
> that determination as to Mr. Meltz's state of mind is going to involve his
> assessment about whether or not Mr. Asch is serious or not.  So if you accept this
> for purposes of argument that Mr. Meltz said on tape that he didn't think Mr.
> Asch was serious about committing a kidnap if, in fact, he said that[,] that would
> be probative on the question of whether there was a meeting of the minds to
> commit a kidnapping.

(Tr. 784-85)  The Government conceded that the foregoing analysis was correct. (Tr. 785)

Given the Government's intelligibility objection, the Court listened to the audio

recordings in camera.  After doing so, this Court commented that "it's very difficult to hear

what's being said and it's said very quickly."  (Tr. 932)  The Court concluded, however, that –

notwithstanding a dispute between the parties as to what was said at the very end of the meeting

– the audio-only recording and the audio portion of the audio-visual recording were intelligible

when played in a confined space on a computer with speakers installed.  (Id.)  This Court also

noted that the competing transcripts submitted by the Government and Asch's counsel (GX 357-

T-2; Asch DX K) were "not wildly different."  (Tr. 929)

The parties disagreed at trial about what the audio recording showed as to Meltz's

response to Agent Spivack's query about whether Asch "would go through with" the kidnapping

plan.  Asch's counsel argued that the audio recording showed that Meltz had stated that he did

not think that Asch would "go through with it," while the Government maintained that Meltz had

said the opposite.  (Tr. 779-80)

The disputed portion of the April 14, 2013 conversation between Agent Spivack and Meltz took place outside, in the restaurant's parking lot, at the conclusion of the meeting. (Tr. 1067-68) This portion of the meeting is barely audible. See GX 357. Moreover, while the audio-only recording captures the entirety of the conversation, the audio-video recording abruptly ends before Meltz answers Agent Spivack's question about whether Asch would "go through with" the kidnapping plan.[17] (Tr. 1067-68)

The Government and Asch's counsel agreed that the following exchange took place at the conclusion of the meeting:

UC:     Um, in terms of like, with Chris. You trust him, right?

Meltz:  To a degree. (UI) To a degree. I, I trust him. I don't know if he would go through with it.

UC:     Oh really?

Meltz:  (UI)

UC:     You don't think he would go through with it?

(Compare Asch DX K with GX 357-T-2)

The Government and defense counsel disagreed, however, as to Meltz's response to Agent Spivack's question. Defense counsel submitted a transcript indicating that Meltz stated, "I . . . He wouldn't," to which Agent Spivack replied, "Yeah, I know that." (Asch DX K) The Government submitted a transcript indicating that Meltz said, "I . . . He would and – ," to which Agent Spivack responded, "Yeah, I know he would." (GX 357-T-2)

_____

[17] The parties entered into a testimonial stipulation (GX 1006) providing that, if called to testify, an FBI agent would state that the audio-video recording device worn by Agent Spivack at the April 14, 2013 meeting had a battery life of about 90 minutes, and that the device had "captured 93 minutes and 48 seconds of audio and video data." (GX 1006; Tr. 1066) The stipulation further provided that the agent would testify that the "device stopped recording during the meeting as a result of the device's battery running out of power." (GX 1006; Tr. 1066-67)

Ultimately, the Government offered – and the Court received by stipulation (GX 1007; Tr. 1065) – the audio-only recording of the meeting, as well as the audio portion of the audio-video recording (GX 357). The competing transcripts were provided to the jury in accordance with the parties' stipulation (GX 1007; see Tr. 1065) concerning the admission of the audio recordings (GX 357).

As to the presentation of the audio recording evidence, the Court used the following procedure:

> [T]he [audio portion of the] video version of [G]overnment Exhibit 357 will be played. I'm going to instruct [the Government's paralegal] to play that portion three times. The [audio portion of the] video version of the conversation is much clearer than the audio[-only] version, and I believe playing it three times is adequate for the jury to understand what that version of the conversation, what the content of that version of the conversation is. I will then distribute the parties['] competing transcripts concerning the audio[-only] portion of the meeting. So that will be [G]overnment Exhibit 357-2 and . . . [D]efendant Asch [E]xhibit K. I'm going to direct [the Government's paralegal] to play the audio version eight times. The jury will be instructed to listen to the tape four times using one side's transcript, and then to switch to the other side's transcript for the remaining four plays of the tape.

(Tr. 1048-49)

Prior to the audio recordings being played for the jury, the Court gave the jury the following instruction:

> As with all other transcripts that I have previously permitted the parties to distribute for you, the transcripts are only for your assistance [in] listening to the tape. As I've told you many times already[,] but let me repeat it, the evidence is what you hear on the tape. The evidence is not what's on the transcript. If there is a discrepancy between what is on the tape[,] you must rely on what you hear on the tape.
>
> Now this instruction is particularly important with respect to the tape you're about to hear because there are competing versions. You will not be given one transcript as to one of these conversations, one of these tape recorded excerpts[,] but instead you will receive two transcripts. One is a version that the defense [co]ntends reflects what is said. And the other transcript is a somewhat different version the government has prepared and reflects what the government contends is said during the conversation. So I wanted to emphasize to you my earlier

instructions on the point that what matters is what you people hear on the tape, not what the lawyers have put into a transcript. That's critically important given the exercise that we are about to engage in.

(Tr. 1070-71)[18] The Court repeated the substance of this instruction in its charge to the jury.

(Tr. 1496) See United States v. Ben-Shimon, 249 F.3d 98, 101 (2d Cir. 2001) (where accuracy of tape transcripts is disputed, "'[a] limiting instruction by the district court concerning the use of transcripts, which includes an instruction that the jury is the ultimate factfinder, should alleviate any prejudice arising from the introduction of the transcripts'") (quoting United States v. Chalarca, 95 F.3d 239, 246 (2d Cir. 1996).

After the jury listened to the audio recordings of the April 14, 2013 meeting with the competing transcripts, Agent Spivack – on the Government's re-direct examination – offered yet a third version of the words spoken by Meltz. Agent Spivack testified that Meltz had actually responded, "I . . . He would do it." (Tr. 1078) Spivack testified that he had listened to the recordings "dozens of times" during a break in his testimony, that he had reviewed the Government's proffered transcript before re-taking the witness stand (Tr. 1083-84), and that he

---

[18] In considering the recordings and transcripts in camera, and in deciding to provide competing transcripts to the jury, this Court followed well established Second Circuit precedent:

> Before either tapes or transcripts are submitted to the jury, the judge should listen to the tapes and examine the transcripts in camera, receiving both sides' objections to the proposed evidence. United States v. Bryant, 480 F.2d 785 (2d Cir. 1973) at 789. In cases where the defense and prosecution disagree as to the contents of the tape, the proper procedure is for the jury to receive transcripts of both sides' versions. This was the procedure condoned in United States v. Carson, 464 F.2d 424 (1972) at 436-37, and specifically approved again in Bryant, supra at 791, n.4.

United States v. Chiarizio, 525 F.2d 289, 293 (2d Cir. 1975); see also United States v. Ben-Shimon, 249 F.3d 98, 101 (2d Cir. 2001) ("If the accuracy of the transcript is contested, competing transcripts may be submitted to the jury.") (citing Chiarizio); United States v. Brown, No. 10 Cr. 675 (SJF), 2011 WL 3163171, at *5 (E.D.N.Y. July 25, 2011) (same).

had concluded that "what [Meltz] actually said was different than what was . . . on the transcript provided by the government." (Tr. 1084)

### D.     The April 15, 2013 Arrest of Asch

The next day – April 15, 2013 – Asch and Darren met at the corner of Broadway and Vesey Street in lower Manhattan, near the Path train station for the World Trade Center. (Tr. 576-77) The stated purpose of the meeting was to conduct surveillance of the female undercover agent. (Tr. 576) Asch brought two bags to this meeting. Asch's bags contained, inter alia, bleach; rubbing alcohol; vinyl, leather, and latex gloves; paper towels; cable ties; vise grips; duct tape; three copies of the Construction Materials list; a taser; rope; a leg-spreader; a dental retractor; and speculums and skewers. (Tr. 577, 579-91; GX 604, 604A-606K, 605, 605A-M) After Darren and Asch conducted surveillance of the female undercover agent, Asch was arrested. (Tr. 581-82)

## IV.     PROCEDURAL HISTORY

The S4 Indictment charges Van Hise, Asch, and Meltz – in Count One – with participating in a kidnapping conspiracy between spring 2011 and January 2013. (S4 Indictment (Dkt. No. 204) ¶¶ 1-3) The Government contended at trial that the targets of that kidnapping conspiracy were members of Van Hise's family, including his wife, his sister-in-law, and his sister-in-law's minor children. (Tr. 21, 1336-37, 1512) In Count Two, the Government charges Asch and Meltz with conspiring between January 2013 and April 15, 2013 to kidnap the female undercover agent. (S4 Indictment (Dkt. No. 204) ¶¶ 4-6)

Prior to trial, Van Hise moved for a severance. Van Hise contended that "(1) all three defendants made statements to the FBI that present issues under Bruton v. United States, 391 U.S. 1236 (1968) and Crawford v. Washington, 541 U.S. 36 (2004); (2) his defense is antagonistic to that of his co-defendants; and (3) the evidence against his co-defendants is

overwhelming in comparison to the evidence against Van Hise and will unfairly prejudice him at trial." United States v. Van Hise, No. S4 12 CR 847(PGG), 2013 WL 6877319, at *7 (S.D.N.Y. Dec. 31, 2013) (citing Van Hise Br. (Dkt. No. 175) at 14-15; Van Hise Supp. Br. (Dkt. No 214) at 7-9). This Court denied Van Hise's severance motion. Id. at *10-*14.[19]

On January 16, 2014, Meltz pleaded guilty to a superseding information charging him with participating in two separate kidnapping conspiracies, in violation of 18 U.S.C. § 371.[20] (Jan. 16, 2014 Tr. (Meltz guilty plea allocution) (Dkt. No. 257)) Meltz was charged, in Count One, with conspiring to kidnap "Victim-1," a "specific woman," and in Count Two, with conspiring to kidnap the female FBI undercover agent. (S5 Information (Dkt. No. 242) ¶¶ 1-3) In his allocution, Meltz admitted that (1) he had provided advice to Asch "regarding the kidnapping of an adult relative of Michael Van Hise," and that he had "assisted in the planning of the kidnapping"; and (2) he had provided "advice and assistance in the planning of the [proposed] kidnapping [of the female FBI undercover agent]." (Jan. 16, 2014 Tr. (Meltz guilty plea allocution) (Dkt. No. 257) at 27)

The trial of Van Hise and Asch began on February 24, 2014. At the close of the Government's case, Van Hise and Asch moved jointly under Fed. R. Crim. P. 29(a) for a judgment of acquittal on Count One, and Asch moved for a judgment of acquittal on Count Two. (Tr. 1118, 1125, 1127) The Court reserved decision. (Tr. 1134)

---

[19] This Court likewise denied Asch's severance motion, which was based on antagonistic defenses and the claim that Van Hise's post-arrest statements presented Bruton and Crawford issues. United States v. Van Hise, 2013 WL 6877319 at *7, *10, *12-*13) (citing Asch Br. (Dkt. No. 219) at 4-6).

[20] On September 16, 2014, this Court sentenced Meltz to the statutory maximum term of ten years' imprisonment, to be followed by three years' supervised release. (Dkt. No. 373)

At trial, Van Hise and Asch each presented a "fantasy" defense, arguing that their respective electronic communications about kidnapping, rape, torture, and murder were not "real," but were instead part of a sado-masochistic role-play fetish. (E.g., Tr. 34-36, 40, 1127, 1369-70, 1413-14) In support of this argument, both men relied heavily on a videotaped deposition given by the founder of the DFN website, Sergey Merenkov. This video had been admitted at Gilberto Valle's trial. (Mar. 5, 2013 Tr. (Dkt. No. 145, United States v. Valle, 12 Cr. 847 (PGG)) at 1357-61)

Prior to trial, Van Hise moved in limine for the admission of the Merenkov deposition. (Van Hise Mot. (Dkt. No. 233)) The Government did not object to admission of the Merenkov deposition at that time, as long as references to Valle were redacted. (Gov't Opp. (Dkt. No. 245) at 9-10; see Tr. 1171) When Van Hise and Asch jointly sought to introduce the Merenkov deposition at trial, however, the Government objected on relevance grounds. While the Government acknowledged that

> [t]here is evidence that Asch and Van Hise met on DFN and that the undercover agents first reach out to Mr. Asch on DFN[,] . . . all of the communications related to Count One occurred over private e-mail o[r] electronic [chats]. And none of the communications on Count Two[,] other than the initial contact between Asch and the undercover[,] occurred on DFN.

(Tr. 1162-63)

This Court concluded that admission of the Merenkov deposition was necessary in order to avoid unfair prejudice to the Defendants. Given that the Government had not objected to Van Hise's motion in limine seeking admission of the deposition, the Defendants were justified in assuming that the deposition would be admitted at trial. (Tr. 1169) Aside from the Merenkov deposition and a stipulation concerning the FBI's surveillance of Asch, (Asch DX M; see Tr. 1309-11), Asch did not call any witnesses or present any evidence.

Van Hise called several witnesses, including Bolice Van Hise. Mrs. Van Hise testified that she knew Van Hise used the DFN website; that she and Van Hise engaged in voluntary sexual role-play involving strangulation and asphyxiation; and that she was aware Van Hise was having online discussions with other men about raping her and her sister. (Tr. 1244-45, 1247-48, 1255, 1257, 1271, 1280-81) Bolice Van Hise also testified that she lived with her sister, Sheri Davis, during the summer of 2012, and with her mother during the fall of 2012, and that tenants had no access to the basements in either location. (Tr. 1241-43) Mrs. Van Hise also denied having any suicidal thoughts during her marriage to Van Hise. (Tr. 1251)

On cross-examination, however, Mrs. Van Hise acknowledged that she had told the Trenton Police Department in August 2012, that "Van Hise used to rape and act [out] sexual encounters with [her] and that [she] didn't like it." (Tr. 1254) Mrs. Van Hise also told police that Van Hise "used to strangle [her] during sex," and "place plastic bags over [her] head and take pictures of [her]," and that Van Hise's conduct made her "uncomfortable." She told police that she "asked him to stop." (Tr. 1255) She also acknowledged telling the Trenton Police Department that she had asked Van Hise to stop accessing the DFN website, but that he had continued to do so against her wishes. (Tr. 1256-57) Mrs. Van Hise also acknowledged on cross-examination that she was not familiar with Meltz or Asch; that she did not know that Van Hise was engaging in Internet discussions involving her own children and those of Sheri Davis; and that she was not aware that Van Hise had sent photographs of Sheri Davis and her children to men over the Internet. (Tr. 1248-49, 1270-71, 1273)

At the close of all the evidence, the Defendants renewed their Rule 29 motions, and the Court again reserved decision. (Tr. 1330-31) On March 14, 2014, the jury returned a guilty verdict as to both Defendants and both counts. (Tr. 1565)

Pending before the Court are the Defendants' motions for a judgment of acquittal or, in the alternative, for a new trial. (Def. Joint Mot. (Dkt. No. 334); Van Hise R. 33 Mot. (Dkt. No. 315); Asch R. 33 Mot. (Dkt. No. 336))

## DISCUSSION

### I. DEFENDANTS' SUFFICIENCY AND WEIGHT OF THE EVIDENCE CHALLENGES UNDER FED. R. CRIM. P. 29 AND 33

Van Hise and Asch jointly contend that the Government's evidence as to Count One is insufficient or – in the alternative – that the jury's verdict is against the weight of the evidence. (Def. Joint Motion (Dkt. No. 334); Van Hise R. 33 Br. (Dkt. No. 316); Asch R. 33 Br. (Dkt. No. 337))

#### A. Legal Standards

##### 1. Rule 29 Standard

Federal Rule of Criminal Procedure 29(a) provides that a court shall, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Rule 29(b) permits the Court to "reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." "Under Rule 29(b), when a district court reserves decision on a defendant's Rule 29 motion at the close of the Government's evidence, 'it must decide the motion on the basis of the evidence at the time the ruling was reserved.'" United States v. Truman, 688 F.3d 129, 139 (2d Cir. 2012) (quoting Fed. R. Crim. P. 29(b)).

A defendant seeking to challenge a jury's guilty verdict "carries a heavy burden." United States v. Oguns, 921 F.2d 442, 449 (2d Cir. 1990). In evaluating a sufficiency challenge,

this Court "'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)). "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'" United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)).

Under Rule 29, the critical question "is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Downing, 297 F.3d 52, 56 (2d Cir. 2002) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in Jackson). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Cavazos v. Smith, 556 U.S. 1, 2 (2011) (per curiam). In other words, Rule 29(c) "does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).

"[I]f [courts] are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, [however,] [they] must take seriously [their] obligation to assess the record to determine, as Jackson instructs, whether a jury could reasonably find guilt beyond a reasonable doubt." United States v. Clark, 740 F.3d 808, 811 (2d Cir. 2014) (emphasis in original). While a defendant challenging a jury's verdict "carries a heavy burden," Oguns, 921 F.2d at 449, that "burden is not

an impossible one." United States v. Kapelioujnyi, 547 F.3d 149, 153 (2d Cir. 2008) (citing United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004)). Moreover, "a conviction based on speculation and surmise alone cannot stand." United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994) (citing United States v. Wiley, 846 F.2d 150, 155 (2d Cir. 1988)). "[T]he government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." Id. (citing Jackson, 443 U.S. at 319; United States v. Macklin, 671 F.2d 60, 65 (2d Cir. 1982)). "The evidence, in other words, must be of such persuasive quality that a jury could reasonably find the essential elements beyond a reasonable doubt on the basis of that evidence." United States v. Jackson, 368 F.3d 59, 63 (2d Cir. 2004) (emphasis in original).

In assessing a sufficiency challenge, a court "'looks at the "evidence in its totality"'" and collectively, United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002) (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000))) – "'not in isolation but in conjunction.'" Mariani, 725 F.2d at 865 (quoting United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969)).

Moreover, while a jury is "permitted to enter an unassailable but unreasonable verdict of 'not guilty,'" it does not have the "power to enter an unreasonable verdict of guilty." Jackson, 443 U.S. at 318 n.10 (citing United Bhd. of Carpenters & Joiners of Am. v. United States, 330 U.S. 395, 408 (1947)). Accordingly, in reviewing a sufficiency challenge, "'specious inferences are not indulged, because [it] would not satisfy the [Constitution] to have a jury determine that the defendant is probably guilty.'" Lorenzo, 534 F.3d at 159 (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004) (quoting Sullivan v. Louisiana, 508 U.S.

275, 278 (1993))) (alterations and emphasis in original) (internal quotation marks and citations omitted).

Finally, the Second Circuit has made clear that "'[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" Coplan, 703 F.3d at 69 (quoting United States v. Huezo, 546 F.3d 174, 193 (2d Cir. 2008)) (alteration in original); see also D'Amato, 39 F.3d at 1256 ("[T]he government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" (quoting United States v. Mulheren, 938 F.2d 364, 372 (2d Cir. 1991))). Accordingly, a district court must grant a defendant's Rule 29 motion where the evidence "viewed in the light most favorable to the government, remains, at best, in equipoise." Coplan, 703 F.3d at 69.

### a.      Review of Jury Determinations Concerning Criminal Intent

In reviewing the sufficiency of the evidence here, this Court is mindful of the jury's critical role in our legal system, and the daunting standard for overturning a jury's determinations regarding a defendant's criminal intent. "[T]he jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence." United States v. Gaudin, 515 U.S. 506, 514 (1995). The jury acts as "the oracle of the citizenry in weighing the culpability of the accused, and should it find him guilty it condemns him with the full legal and moral authority of the society." United States v. Gilliam, 994 F.2d 97, 101 (2d Cir. 1993).

Ordinarily, "[t]he question of whether criminal intent is inferable from the facts proved is a question for the jury." United States v. Speare, 297 F.2d 408, 410 (2d Cir. 1962); see also Morissette v. United States, 342 U.S. 246, 274 (1952) ("Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the

jury."); United States v. Sullivan, 98 F.2d 79, 80 (2d Cir. 1938) ("Plainly the issue of criminal

intent was for the jury."); United States v. Mehanna, 735 F.3d 32, 47 (1st Cir. 2013) ("It is the

jury's role – not that of the [court] – to choose between conflicting hypotheses, especially when

such choices depend on the drawing of inferences and elusive concepts such as motive and

intent."); United States v. Depew, 932 F.2d 324, 326 (4th Cir. 1991) ("There was sufficient

evidence to establish the essential elements of a conspiracy, and it was for the jury to decide

whether the appellant's actions represented fantasies or whether he and his coconspirator

intended to go through with their gruesome plan."); United States v. Malsom, 779 F.2d 1228,

1233 (7th Cir. 1985) ("Whether or not the necessary intent was established is in all cases a

question for the trier of fact to resolve.").

      On a Rule 29 motion, "[w]here . . . the issue is one of intent, the question is

whether 'the inferences [in favor of the Government] are sufficiently supported to permit a

rational juror to find that th[is] element, like all elements, is established beyond a reasonable

doubt.'" United States v. Workman, 80 F.3d 688, 699 (2d Cir. 1996) (quoting Martinez, 54 F.3d

at 1043) (second alteration in Workman). "A conspiracy conviction cannot be sustained unless

the government established beyond a reasonable doubt that the defendant had the specific intent

to violate the substantive statute." United States v. Hassan, 578 F.3d 108, 123 (2d Cir. 2008)

(emphasis in original) (citing United States v. DiTommaso, 817 F.2d 201, 218 (2d Cir. 1987)).

Thus, a motion for a judgment of acquittal must be granted where, "in order to find the essential

element of criminal intent beyond a reasonable doubt, a rational juror would have to speculate."

United States v. Stewart, 305 F. Supp. 2d 368, 370 (S.D.N.Y. 2004).

      A district court must, however, "defer to the jury's determination of the weight of

the evidence . . . , and to the jury's choice of the competing inferences that can be drawn from

the evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998) (citation omitted).

"[A] court, whether at the trial or appellate level, may not usurp the role of the jury by

substituting its own determination of the weight of the evidence and the reasonable inferences to

be drawn for that of the jury." United States v. MacPherson, 424 F.3d 183, 187 (2d Cir. 2005)

(alterations, internal quotation marks, and citations omitted). "'[I]f the court 'concludes that

either of . . . two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court]

must let the jury decide the matter.'" Autuori, 212 F.3d at 114 (quoting Guadagna, 183 F.3d at

129) (alterations in Autuori) (ellipsis added). A court may only overturn a defendant's

conviction if evidence concerning his or her intent, "'viewed in the light most favorable to the

prosecution[,] gives equal or nearly equal circumstantial support to a theory of guilt and a theory

of innocence,'" Coplan, 703 F.3d at 69 (quoting Huezo, 546 F.3d at 193), or where the balance

tips in the defendant's favor.

      **b.**      **Requirements to Sustain a Conspiracy Conviction**

Conspiracy statutes reflect a societal choice to detect and punish criminal

wrongdoing at its inception, before the object of the illegal agreement has been realized or

achieved. "[T]he essence of a conspiracy is 'an agreement to commit an unlawful act.'" United

States v. Jimenez Recio, 537 U.S. 270, 274 (2003) (quoting Iannelli v. United States, 420 U.S.

770, 777 (1975)) (citation omitted). While "the law does not punish criminal thoughts," in a

criminal conspiracy "the criminal agreement itself is the actus reus," United States v. Shabani,

513 U.S. 10, 16 (1994).

Conspiracy law is premised on the long-standing belief that criminal agreements

themselves warrant punishment separate and apart from the substantive crimes that are their

objects. See, e.g., United States v. Eppolito, 543 F.3d 25, 47 (2d Cir. 2008) ("Where there is an

agreement to commit an unlawful act, '[t]hat agreement is a distinct evil, which may exist and be

punished <u>whether or not the substantive crime ensues</u>.'" (alteration and emphasis in <u>Eppolito</u>)

(quoting <u>Jimenez Recio</u>, 537 U.S. at 274 (internal quotation marks and citation omitted))).

Accordingly, the conspiracy and the substantive crime that is the object of the conspiracy do not

merge, and individuals can be charged with, convicted of, and punished separately for both.

      The elements of conspiracy are generally more easily proven than the elements of

either a substantive offense or an attempt, the latter of which typically requires proof that a

defendant took a "substantial step" toward completing a crime. Conspiracy merely requires

proof of "(1) an agreement among the conspirators to commit an offense; (2) specific intent to

achieve the objective of the conspiracy; and (3) [here] an overt act to effect the object of the

conspiracy." <u>United States v. Pinckney</u>, 85 F.3d 4, 8 (2d Cir. 1996) (citation omitted).

"'Whether the substantive crime itself is, or is likely to be, committed is irrelevant,'" <u>United</u>

<u>States v. Wallach</u>, 935 F.2d 445, 470 (2d Cir. 1991) (quoting <u>United States v. Rose</u>, 590 F.2d

232, 235 (7th Cir. 1978)), and "'impossibility of success is not a defense.'" <u>Hassan</u>, 578 F.3d at

123 (quoting <u>Jimenez Recio</u>, 537 U.S. at 276). "'[T]he crime of conspiracy is complete upon the

agreement to violate the law, as implemented by one or more overt acts . . . , and is not at all

dependent upon the ultimate success or failure of the planned scheme.'" <u>United States v.</u>

<u>Trapilo</u>, 130 F.3d 547, 552 n.9 (2d Cir. 1997) (quoting <u>United States v. Everett</u>, 692 F.2d 596,

600 (9th Cir. 1982)).

      Moreover, a defendant may be convicted of conspiracy without having entered

into a formal or express agreement. "'[I]t is enough that the parties have a tacit understanding to

carry out the prohibited conduct.'" <u>United States v. Rubin</u>, 844 F.2d 979, 984 (2d Cir. 1988)

(quoting <u>United States v. Wardy</u>, 777 F.2d 101, 107 (2d Cir. 1985)). A conspiracy may also

exist "even if a conspirator does not agree to commit or facilitate each and every part of the

substantive offense." Salinas v. United States, 522 U.S. 52, 63 (1997) (citation omitted). "The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." Salinas, 522 U.S. at 63-64 (citing Pinkerton v. United States, 328 U.S. 640, 646 (1946)). Because "[s]ecrecy and concealment are essential features of successful conspiracy," prosecutors may prove the "essential nature of the plan and [a defendant's] connections with it" through circumstantial evidence and inferences. Blumenthal v. United States, 332 U.S. 539, 557 (1947); see also United States v. Stewart, 485 F.3d 666, 671 (2d Cir. 2007) ("Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence.").

Although the Government may rely on circumstantial evidence and reasonable inferences to establish the elements of a conspiracy, "because '[c]onspiracy is a specific intent crime,'" the Government must demonstrate that the defendant had the specific intent to both engage in the conspiracy and commit the underlying crime. Hassan, 578 F.3d at 123 (quoting United States v. Morgan, 385 F.3d 196, 206 (2d Cir. 2004)) (alteration in Hassan); see id. ("A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute." (emphasis in original) (citing DiTommaso, 817 F.2d at 218)). A defendant's specific intent may, however, be proven by circumstantial evidence, see Huezo, 546 F.3d at 180, and – under appropriate circumstances – intent may be inferred from a single act. Id. ("'[A] single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy.'" (quoting United States v. Tramunti, 513 F.2d 1087, 1111 (2d Cir. 1975))).

"As an added protection to defendants against punishment for mere talk, in some instances an overt act must take place in furtherance of the conspiracy." United States v. Gigante, 982 F. Supp. 140, 169 (E.D.N.Y. 1997) (citation omitted), aff'd, 166 F.3d 75 (2d Cir. 1999). Where – as here – the applicable conspiracy statute contains an overt act requirement, the purpose of that element is to require the Government to demonstrate that the conspiracy was actually "at work." Carlson v. United States, 187 F.2d 366, 370 (10th Cir. 1951) (citation omitted). The overt act may itself be lawful and need not be charged in the indictment. See, e.g., Iannelli, 420 U.S. at 786 n.17 ("The [overt] act can be innocent in nature, provided it furthers the purpose of the conspiracy."); United States v. Salmonese, 352 F.3d 608, 619 (2d Cir. 2003) (noting "'the well-established rule of this and other circuits that the overt act element of a conspiracy charge may be satisfied by an overt act that is not specified in the indictment, at least so long [as] there is no prejudice to the defendant'" (quoting United States v. Frank, 156 F.3d 332, 337 (2d Cir. 1998))).

### 2. Rule 33 Standard

Pursuant to Federal Rule of Criminal Procedure 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, see United States v. Leslie, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence, United States v. Ferguson, 246 F.3d 129, 136 (2d Cir. 2001) ("We cannot say that the district judge abused her discretion when she concluded that the weight of the evidence showed that [the defendant] was an outside hit man and not a [gang] member acting to further that membership.").

The Second Circuit has explained that

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand
> would be a manifest injustice. The trial court must be satisfied that competent,
> satisfactory and sufficient evidence in the record supports the jury verdict. The
> district court must examine the entire case, take into account all facts and
> circumstances, and make an objective evaluation. There must be a real concern
> that an innocent person may have been convicted. Generally, the trial court has
> broader discretion to grant a new trial under Rule 33 than to grant a motion for
> acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority
> sparingly and in the most extraordinary circumstances.

Id. at 134 (internal quotation marks and citations omitted).

Under Rule 33, "[i]n the exercise of its discretion, the court may weigh the

evidence and credibility of witnesses." Autuori, 212 F.3d at 120 (citing Sanchez, 969 F.2d at

1413). However, "[t]he district court must strike a balance between weighing the evidence and

credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." Ferguson, 246 F.3d at

133 (quoting Autuori, 212 F.3d at 120) (alteration in Ferguson). Finally, in contrast to the

applicable analysis under Rule 29, a district court considering a Rule 33 motion need not view

the evidence in the light most favorable to the Government. United States v. Lopac, 411 F.

Supp. 2d 350, 359 (S.D.N.Y. 2006) (citing United States v. Ferguson, 49 F. Supp. 2d 321, 323

(S.D.N.Y. 1999), aff'd, 246 F.3d 129 (2d Cir. 2001)).

**B.    Analysis**

The S4 Indictment charges Van Hise and Asch with violating 18 U.S.C. §

1201(c). (S4 Indictment (Dkt. No. 204)) Section 1201(c) provides:

> If two or more persons conspire to violate this section and one or more of such
> persons do any overt act to effect the object of the conspiracy, each shall be
> punished by imprisonment for any term of years or for life.

18 U.S.C. § 1201(c).

To obtain a conviction of Van Hise on Count One, and Asch on Counts One and

Two, the Government was required to demonstrate that each man "agreed with another to

commit [one or more kidnappings]; that he knowingly engaged in the conspiracy with the specific intent to commit the [kidnapping or kidnappings] that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed [in the Southern District of New York]." United States v. Monaco, 194 F.3d 381, 386 (2d Cir. 1991) (internal quotation marks and citation omitted); see also Naranjo, 14 F.3d at 147.

### 1.    Count One:  The Van Hise/Asch/Meltz Conspiracy

Van Hise and Asch jointly argue that the Government's evidence as to Count One is insufficient – or, alternatively, that the jury's verdict is contrary to the weight of the evidence – because the Government did not demonstrate that (1) a genuine conspiratorial agreement existed; (2) either defendant specifically intended to commit a kidnapping; or (3) an overt act in furtherance of the charged conspiracy was committed by one or more of the co-conspirators during the existence of the conspiracy.  (Def. Joint Motion (Dkt. No. 334); Van Hise R. 33 Br. (Dkt. No. 316); Asch R. 33 Br. (Dkt. No. 337))

### a.    Existence of an Unlawful Agreement

Van Hise and Asch argue that the Government's evidence is not sufficient to make out a genuine conspiratorial agreement.  The Defendants contend that the evidence on Count One consists almost entirely of emails and internet chats in which Van Hise, Asch, and Meltz "describe several different scenarios involving several different women."  (Def. Joint Br. (Dkt. No. 334) at 4)  According to the Defendants, such evidence is not sufficient to establish an agreement to commit a kidnapping, because "[t]here is no resolution as to who will be the victim, when it will occur, or how it will happen."  In other words, the "basic components of any 'plan' or 'agreement' are not established."  (Id.)

As to Count One, the Government's theory at trial was that Van Hise, Asch, and Meltz, "target[ted] women and young children in the fall of 2012," specifically "Van Hise's

wife, his stepdaughter, his sister-in-law, and his four nieces, each of whom was under the age of ten." (Tr. 21; see also id. 1342 ("[W]e've talked about how the government has proven beyond a reasonable doubt that the three men, Van Hise, Asch and Meltz entered into a real agreement to kidnap members of Van Hise's family. . . .")) The Government contended that the Defendants' discussions about a kidnapping came to a head in "late October 2012," when Asch indicated that he "was ready to put their plan into action" by "go[ing] after Van Hise's wife." According to the Government, these "plans came to an abrupt halt," because "[t]hat very same week" Gilberto Valle was arrested, forcing "Van Hise . . . to abandon his plan[s] with Asch." (Tr. 23)

Consistent with the Government's theory, this Court instructed the jury – without objection – that, in order to find Asch or Van Hise guilty on Count One, it was required to find, inter alia,

> that the charged kidnapping conspiracy existed, that is, that an agreement or understanding between two or more persons existed to commit a kidnapping of one or more of Bolice Van Hise, Mrs. Van Hise's stepdaughter, Sher[i] Davis, or Sher[i] Davis' children between the spring of 2011 and January 2013.

(Tr. 1514-15)[21]

---

[21] With respect to the unlawful agreement requirement, the Court's jury instructions repeatedly emphasized that the jury had to find – before concluding that a defendant was guilty – that the defendant under consideration had entered into an agreement to commit an actual kidnapping, and that there had been a meeting of the minds on this point:

> [B]efore you can convict a defendant on a kidnapping conspiracy charge, you must conclude that the government has proven beyond a reasonable doubt that that defendant actually intended that the kidnapping alleged by the government take place, and that that defendant agreed with, and had a meeting of the minds with a coconspirator named in the indictment that the kidnapping alleged in the indictment would actually take place.

. . . .

> Mr. Van Hise and Mr. Asch deny that they ever agreed or intended to participate in an actual kidnapping, . . . and they contend that their statements and actions reflect only fantasies, fictional stories and make-believe role play. If you find that Mr. Van Hise and Mr. Asch did no more than engage in fantasy and role play, and that they never

This Court concludes that there is sufficient evidence to support the jury's finding that Van Hise and Asch entered into an unlawful agreement to kidnap one or more of Van Hise's family members.

As an initial matter, a reasonable jury could have found that the foundation for the Van Hise/Asch/Meltz conspiracy was laid as far back as June 2008, when Asch and Meltz began building a relationship of trust by sharing their mutual interest in (1) strangling and murdering women; (2) being "able to turn some of [their] fantasies into real[i]ty"; and (3) finding "a partner" with shared interests whom they could "trust." (GX 201, GX 202) A reasonable jury could likewise have found that Asch and Meltz were cautiously waiting for the right opportunity to turn their fantasies "into reality," because – as reflected in the men's email correspondence and Asch's statements to Darren – they were concerned about "getting caught." (GX 203, GX 361)

The evidence shows that by at least early 2012, Asch had begun communicating with Van Hise about kidnapping women. As evidenced by their in-person meeting in Trenton, New Jersey in early 2012, Asch and Van Hise's discussions about kidnapping women went beyond idle chatter over the Internet. During this meeting, Van Hise showed Asch a bar he frequented where the two could "pick up a hooker," and he drove Asch to two locations that Van

---

agreed or intended to participate in an actual kidnapping, you must find them not guilty.

In order to convict a defendant of kidnapping conspiracy, you must find that the government has proven beyond a reasonable doubt that that defendant actually intended that the kidnapping alleged by the government take place. Idle chatter is not sufficient. Moreover, the government must also demonstrate by proof beyond a reasonable doubt that that defendant agreed with, and had a meeting of the minds with, a coconspirator named in the indictment that the kidnapping alleged in the indictment would actually take place.

(Tr. 1501-02, 1520-21)

Hise thought might be suitable for "dumping" a female victim's body. The two talked about the merits of Van Hise's proposed "dumping" sites – an alley and a park – with Asch opining that the first was "too residential," and that "you need to go to the mountains." (Tr. 56, 72, 122, 129; GX 205, GX 252, GX 352) In meeting face-to-face in Van Hise's hometown to discuss possible venues from which a woman could be procured and then disposed of – locations with which Van Hise was familiar – Van Hise and Asch's relationship shifted from a virtual, Internet-based relationship to one grounded in the real, physical world. Given Van Hise and Asch's conduct during this early 2012 meeting, a reasonable jury could have concluded that they were serious about their stated intentions to kidnap a woman.

A reasonable jury could have also concluded that, beginning in or about March 2012, Van Hise and Asch began to focus their plans on potential victims who were members of Van Hise's family, including his wife, his sister-in-law Sheri Davis, and Davis's four minor children. In a March 1, 2012 email exchange, Van Hise asks whether Asch is "still going to try and help me do my sis in law[?]" (GX 206 (Mar. 1, 2012, 15:22:49 -0500)) Although Asch expresses concern that Van Hise "might [be] considered a suspect" were his sister-in-law to disappear, his advice to Van Hise is to put Davis on his "list of vics that your buddies could help you with." (Id. at 3:26 p.m.) When Van Hise follows up on Asch's suggestion that they rape Van Hise's "new born" niece, Asch eagerly responds that "it'd be hot to hold an infant between us so we could fuck both ends." (Id. at 4:43 p.m.) When Van Hise expresses doubt that "thatl ever happen," Asch responds that "it could happen if the circumstances are right." (Id. at 16:44:37 -0500, 4:46 p.m.) Asch goes on to offer encouragement to Van Hise, stating that a kidnapping of Sheri Davis and her four children, while "complicated," was "possible." (Id. at

4:49 p.m.) Van Hise, in turn, responds that he "hope[s] so," because he "want[s] [his] sis in law so bad." (Id. at 16:50:08 -0500)

In June 2012, Van Hise contacts Meltz and asks whether Meltz would "help me do my sis in law and her kids." Meltz responds, "oh yes  to do family is a special treat  she would certainly let you in an she would trust you  until she felt thecord tightening around her lovely neck." (GX 209 (June 30, 3012, 9:05 a.m); id. at 16:56:42 -0700 (PDT))

More discussions among Van Hise, Asch, and Meltz follow concerning the proposed kidnapping and murder of Sheri Davis and her children. In these conversations, Van Hise shares with Meltz and Asch (1) photographs of Davis and her children; (2) the approximate location of Davis's apartment on Eisenhower Avenue in Trenton, a street that is two blocks long; and (3) ideas for abducting and/or murdering Davis and her children. (GX 214-216, GX 241, GX 259; see also Tr. 231-32; GX 910) This evidence, coupled with the fact that Asch and Van Hise had previously met in Trenton to survey potential locations to "dump" a victim's body, provided the jury with a sufficient basis to conclude that a genuine agreement existed to kidnap Sheri Davis and her children.

As to Van Hise's wife Bolice, although Van Hise and Asch discussed kidnapping and murdering a number of people during the period of the charged conspiracy, on August 2, 2012, they agree to "start with [Bolice Van Hise]," the person Van Hise identifies as his "main" victim. (GX 241 (Aug. 2, 2012, 3:16 p.m.); id. at 12:12:18 -0700) From August 2 onwards, the two men discuss various ideas for kidnapping and murdering Mrs. Van Hise, including having Meltz and Asch pose as repair men to gain entry into the apartment building in which she is living; using her history of depression to make her death look like a suicide; and kidnapping her and transporting her to Meltz's home, where they could torture her for several days before

murdering her. (Id. at 12:16:54 -0700; GX 224 (Aug. 2, 2012), GX 241 (Aug. 16, 2012, 4:38 p.m.), GX 252 (Sept. 4, 2012, 3:55 p.m.))

Van Hise and Asch also discuss ruses Van Hise has suggested for luring Bolice Van Hise from her sister's apartment, including pretending that Asch is "a lawyer who needs to talk to her about the car accident papers from last year that she has to sign," or using a fake online persona to offer her money for sex. (GX 259 (Oct. 11, 2012, 10:57:06 PDT -0700); id. (Oct. 12, 11:27:14 PDT -0700)) Van Hise tells Asch that he can meet Bolice "near her sisters youll be the one to meet her and when she goes to give you head you grab her itll be in trenton near eisenhower." (Id.) Asch asks whether he will meet Bolice "in a house or in the car?" and Van Hise replies, "the car." (Id.)

The evidence shows that Asch relayed these ideas to Meltz, who expressed interest in strangling Van Hise's wife. For example, in a September 5, 2012 Internet chat with Asch, Meltz suggests, "we can get her on a Friday and keep her into Sunday." (GX 250 (Sept. 5, 2012, 22:36:26 (UTC))) When Asch asks whether Meltz is referring to "mike's wife," Meltz responds, "yes." (Id. at 22:37:17 (UTC)) Van Hise also transmits photographs of Bolice Van Hise to Asch and Meltz (GX 235, 246)

From this evidence, a reasonable jury could have found that a genuine agreement existed among Van Hise, Asch, and Meltz to kidnap Van Hise's wife.

It is true, of course, that Asch and Meltz repeatedly express concern about Van Hise's impatience, lack of proper planning, and recklessness. (See, e.g. GX 361-T (Jan. 5, 2013, 2:00:05 p.m.) (Asch to Darren: "I think he seemed reckless enough that he just wanted to do something, and then, you know, at one point, he wanted to do his whole family, and I'm thinking, you know, Mike, you know, it's like what are you thinking?"); GX 262 (Oct. 23, 2012,

00:16:13 (UTC)) (Meltz to Asch: "[H]e wants to do his wife and his sister in law and who knows who else and still not be [a] suspect [. . .] he is not in the real world.")) And both men counsel Van Hise that he should "be more careful" if he wants to "jump from fantasy to reality." (GX 211 (July 10, 2012, 21:14:10 (UTC) to 21:14:19 (UTC)) (Meltz expressing concern to Asch that he had "pissed off" Van Hise "when [he] told him he ahs to be more careful if he wants to jump from fantasy to reality"); see also GX 204 (Mar. 1, 2012, 3:56 p.m.) (Asch to Van Hise: "i know how exciting it can be. i've been waiting for many years. [. . .] good things come to those who wait, however. it's easy enough to do this. not getting caught is the hard part."))

Van Hise's lawyer argued in summation that Asch and Meltz's reservations about Van Hise's reliability were so serious that no agreement to kidnap one or more of Van Hise's family members was ever formed:

> [Y]ou will recall that Mr. Asch regularly repeats his opinion that Mr. Van Hise is not – he lacked planning. He didn't have details. Again, this is not a description of two men with a plan. This is not a description of an agreement. Simply put, Mr. Asch and Mr. Van Hise never had a meeting of the minds.

(Tr. 1390)

Although the jury was invited to draw this inference, it was free to accept a reasonable competing inference – namely that, although Asch and Meltz had reservations about Van Hise's impatience, inadequate planning, and lack of sophistication, they had agreed to help him kidnap and murder one or more of his family members, and were attempting to focus his attention on the "practical details" of carrying out a kidnapping and murder scheme without getting caught. There is an ample evidentiary basis for the competing inference, much of it drawn from Asch and Meltz's own words. For example, in a September 5, 2012 email exchange, Asch explains to Meltz that he is "trying to keep [Van Hise] grounded and focused on the practical details." (GX 250 (Sept. 5, 2012, 22:31:14 (UTC))) And Meltz similarly advises Van

Hise that "he [ha]s to be more careful if he wants to jump from fantasy to reality[.]" (GX 211 (July 10, 2012, 21:14:10 (UTC) to 21:14:19 (UTC))) After Van Hise's arrest, Asch tells Darren, "I think [Van Hise was] pretty serious. [. . .] I just think he was short on the planning [. . .] for contingencies and stuff, for stuff to go wrong, because it surely would, you know [. . . .]" (GX 361-T (Jan. 5, 2013) at 3)

As noted above, Van Hise and Asch contend that evidence of an agreement is lacking, because "there is no resolution as to who will be the victim [of the planned kidnapping], when it will occur, or how it will happen." (Def. Joint Br. (Dkt. No. 334) at 4) The law is clear, however, that "'coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.'" United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001) (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990)). The "essential nature of the plan" here was to kidnap one or more of Van Hise's family members. Although the details of the plan – such as the date of the kidnapping or the particular ruse the men would use to isolate the victim – had not been finalized, the "essential nature of the plan" – i.e., the kidnapping and murder of one or more of Van Hise's relatives – had been agreed upon. Indeed, as discussed above, there were numerous communications amongst Van Hise, Asch, and Meltz from which a reasonable jury could have found an agreement to kidnap Van Hise's wife, his sister-in-law, and other members of his family "between the spring of 2011 and January 2013." (Tr. 1514-15). Moreover, in repeatedly offering advice, guidance, and encouragement to Van Hise about how best to commit the crime, Asch and Meltz demonstrated their desire to assist Van Hise in accomplishing the objective of the conspiracy, and to do so safely.

Finally, Van Hise and Asch argue that the Government failed to prove the

existence of a kidnapping conspiracy because "many of the potential scenarios [discussed in the emails and chats] involved acts of rape and/or murder, but not kidnapping as defined in 18 U.S.C. § 1201." (Asch R. 33 Br. (Dkt. No. 337) at 8; accord Van Hise R. 33 Br. (Dkt. No. 316) at 9 ("The Indictment alleged a kidnapping, but the bulk of the emails describe rape and murder.")) "Section 1201(a) plainly reaches a defendant who 'seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away' his victim by deceit, [however,] as well as a defendant who uses physical or psychological force instead of trickery." United States v. Corbett, 750 F.3d 245, 250 (2d Cir. 2014) (citing 18 U.S.C. § 1201(a)). "The list of prohibited acts is disjunctive, prohibiting seizure or abduction or carrying away. There is no element of movement implied in 'seizure', especially because 'carrying away' is listed separately." United States v. Etsitty, 130 F.3d 420, 426 (9th Cir. 1997) (emphasis in original) (citations omitted), opinion amended on denial of reh'g, 140 F.3d 1274 (9th Cir. 1998); see also La Fave, 3 Subst. Crim. L. § 18.2 (2d ed.) ("[W]hile "carries away" is one of the seven possibilities, it is not a necessary element, and thus the offense can be committed even without any asportation.") Plainly, the acts Van Hise, Asch, and Meltz discuss in their emails and chats involve a "seizure" of Van Hise's family members. There is no requirement under the federal kidnapping statute that the conspirators agree to carry away or transport their victims.[22]

---

[22] Prior to 2006, the federal kidnapping statute required, as a jurisdictional predicate, that the victim be "willfully transported in interstate or foreign commerce." In 2006, however, Congress enacted the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. 109-248, § 213, 120 Stat. 587, 616, which provides for federal jurisdiction over kidnappings "when . . . the offender travels in interstate or foreign commerce or uses the mail or any means, facility or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a)(1). Accordingly,

a federal court may now exercise jurisdiction over a kidnapping that involves the interstate transport of a victim, or the interstate travel of an offender or the

The Court concludes that the Government offered sufficient evidence that a genuine agreement existed among Van Hise, Asch, and Meltz to kidnap a member of Van Hise's family, and that the jury's verdict on this point is not against the weight of the evidence.

### b.    **Criminal Intent**

Asch and Van Hise argue that the Government did not offer sufficient evidence to demonstrate that either man "ever specifically intended to commit the crime of kidnapping, a necessary element of this offense." (Def. Joint R. 29 Br. (Dkt. No. 334) at 4)  According to Defendants, their emails and chats – at best – demonstrate an intent to commit rape and murder. (See Van Hise R. 33 Br. (Dkt. No. 316) at 10 ("Assuming arguendo that the emails between Mr. Van Hise and Mr. Asch were more than fantasy, the only intent that can conceivably be discerned from any of the communication is rape and murder.  The government produced no[] reliable evidence that demonstrated Mr. Van Hise's specific intent to kidnap any particular victim."); Asch R. 33 Br. (Dkt. No. 337) at 8 ("[T]here was insufficient evidence to establish that Mr. Asch specifically intended to commit an actual kidnapping.  Many of the scenarios discussed by the defendants involve rape and murder but did not involve kidnapping at all.")).  As discussed above, Defendants' argument is premised on the mistaken notion that the federal kidnapping statute requires an agreement to transport or carry off a victim.  There was ample evidence from which a reasonable jury could infer that Van Hise, Asch, and Meltz had agreed to

_____

offender's use of the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.

United States v. Jacques, No. 2:08-cr-117 (WKS) 2011 WL 1706765, at *4 (D. Vt. May 4, 2011).  Here, the Defendants' use of the Internet – an instrumentality of interstate and foreign commerce – was plainly sufficient to satisfy the jurisdictional predicate.

"seize" or "abduct" one or more of Van Hise's family members. The kidnapping statute requires nothing more.

Separate and apart from the email exchanges and Internet chats among the Defendants, the Government offered substantial evidence of their intent to commit a real kidnapping. First, Van Hise told agents after his January 4, 2013 arrest that "he was serious about kidnapping, raping and killing a woman." (Tr. 72) Moreover, Van Hise and Asch had met in person, in Van Hise's hometown, to survey possible venues to procure a woman and potential locations for "dumping" a victim's body.[23] (GX 205, GX 352; Tr. 72) While this early 2012 meeting may have pre-dated by several months or more the alleged agreement to kidnap one or more of Van Hise's family members, a reasonable jury could have found that – as of the date of that meeting – Van Hise and Asch's interest in committing a sexually-charged kidnapping of a woman had escalated beyond mere Internet fantasy. Van Hise also admitted to FBI agents that he had "migrated" to DFN users who were looking to carry out a real crime or had already done so. While Van Hise told the agents that he sought out such users because he intended to provide information concerning them to law enforcement (Tr. 65, 110), a reasonable jury – in light of the testimony from Hamilton and Trenton, New Jersey police officers (Tr. 126-32) – could have concluded that this explanation was false. A reasonable jury could have relied on this admission and false exculpatory statement to conclude that Van Hise sought out those DFN users "who were most serious about acting on their fantasies or . . . had already done so" because he wanted to carry out a real criminal act. (Tr. 110)

---

[23] Asch and Meltz had also met at Meltz's home, where Meltz showed Asch the basement in which he had allegedly strangled two women. (Tr. 355, 449-50; GX 252 (Sept. 4, 2012, 3:55 p.m.)) Asch and Van Hise discussed torturing Bolice Van Hise in this same basement. (GX 252 (Sept. 4, 2012, 3:55 p.m.))

Van Hise also told an individual using the name "D N" in an email that he was serious about his desire to murder his wife. (GX 245 (Aug. 28, 2012, 1:34 p.m.) ("did you getthe message i am very serious about this no fantasy i want reality.")) When D N suggested that Van Hise might be part of a government sting operation, Van Hise insisted that he was serious about murdering his wife. (Id. at 1:47 p.m. ("no trust me[,] I want this bitch dead and gone im tired of her shit shes a bitch i want her raped tortured and hanged so are you interested for real?"))

Finally, the jury heard recorded conversations in which Asch repeatedly told Darren that he believed that Van Hise was serious about wanting to murder his wife. (See GX 361-T (Jan. 5, 2013) at 3 ("I think he's pretty serious."); GX 405-T (Mar. 5, 2013 22:06:13 EST) at 4 ("I'm not sure his wife knew what (laughter) what he wanted to do to her – she may have thought differently, but you know, she was quoted as saying 'Well, you know, I have dark fantasies too and this is . . . he really wouldn't hurt anybody and blah, blah, blah.' Well[,] I'm glad they think that, but ah . . . [.]")) Asch's uncoerced and voluntary statements to Darren about his understanding of Van Hise's intentions are highly probative of Asch's state of mind, because they demonstrate that he gave practical advice to someone he believed was serious about committing an actual kidnapping and murder.

Asch argues, however, that "he never took any action whatsoever in furtherance of carrying out a kidnapping or any other illegal act with regard to Count One." (Asch R. 33 Br. (Dkt. No. 337) at 7) To be convicted of a conspiracy offense, however, a defendant need not undertake any act beyond entering into the unlawful agreement, because a conspiracy's members are equally liable for the acts of their co-conspirators. Salinas, 522 U.S. at 63-64 ("'The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other.'"). In any event, the Government

demonstrated that Asch took numerous actions in furtherance of the conspiracy charged in Count One, including providing practical advice to Van Hise on many occasions, and repeatedly contacting Meltz to gauge his availability and interest in participating in the kidnapping scheme, and to solicit his advice.

Both Van Hise and Asch argue, however, that this case is "indistinguishable" from that of Gilberto Valle, whose kidnapping conviction this Court overturned on sufficiency grounds. Valle, 301 F.R.D. at 105. In Valle, this Court concluded that

> the evidence offered by the Government at trial is not sufficient to demonstrate beyond a reasonable doubt that Valle entered into a genuine agreement to kidnap a woman, or that he specifically intended to commit a kidnapping.

Valle, 301 F.R.D. at 62. A comparison of the two cases demonstrates that – while the alleged conspiracy in Valle was rooted in lies and demonstrable fantasy – the Van Hise/Asch/Meltz conspiracy was rooted in reality.

As an initial matter, Valle never met with, or sought to meet with, any of his alleged co-conspirators; their relationship "existed solely in cyberspace." Id. at 2, 20-21, 32, 59-60. Perhaps in part because of the absence of face-to-face contact, Valle's communications with his alleged co-conspirators are replete with lies and fantastical elements:

> Valle lied about his age; about his marital status; about the city and area in which he lived; about whom he lived with; and about his job and the hours he worked. He also lied about whether he owned a house "in the middle of nowhere . . . in Pennsylvania"; about whether he owned a van that could be used to transport victims; about whether he had a "pulley-apparatus" in his basement; about whether he was soundproofing his basement; about whether he had a human-size oven and rotisserie; about whether he possessed address and contact information for the purported targets of the kidnapping conspiracy; about whether he was conducting surveillance of targeted women; about how often he was in contact with these women; and about whether he had obtained, or would obtain, rope, duct tape, and a stun gun for purposes of committing a kidnapping.

> Similarly, the details Valle provided to his alleged co-conspirators concerning the targets of the kidnapping conspiracy were – as to identification information – all false. Valle lied about where the purported kidnapping targets lived, their last

names, their occupations, their dates and places of birth, where they had attended or were attending college, and the degrees they had obtained. Despite repeated requests, Valle never provided his alleged co-conspirators with the last names and addresses that would have permitted them to locate and identify these women.

Id. at 60-61.

Moreover, Valle repeatedly set "hard" dates with his alleged co-conspirators on which a kidnapping would take place. Those dates came and went with no kidnapping, however, and neither Valle nor his co-conspirators ever alluded to the fact that the date for a kidnapping had passed without any kidnapping taking place:

> While the alleged conspirators discussed dates for kidnappings, no reasonable juror could have found that Valle actually intended to kidnap a woman on those dates. For example, under the Government's theory, Valle separately "agreed" with two co-conspirators to kidnap three different women on or about the same day, February 20, 2012. Valle was to kidnap one woman in Manhattan; lure another to India or Pakistan; and kidnap a third in Columbus, Ohio. No one was kidnapped on February 20, 2012, however, and no one was kidnapped on any other date "agreed to" or discussed by Valle and his alleged co-conspirators. Moreover, neither Valle nor any of his alleged co-conspirators ever even raised the issue of whether a "planned" kidnapping had taken place, and if not, why not. Dates for "planned" kidnappings pass without comment, without discussion, without explanation, and with no follow-up. The only plausible explanation for the lack of comment or inquiry about allegedly agreed-upon and scheduled kidnappings is that Valle and the others engaged in these chats understood that no kidnapping would actually take place. No other reasonable inference is possible. Because the point of the chats was mutual fantasizing about committing acts of sexual violence on certain women, there was no reason for discussion, inquiry, or explanation when the agreed-upon date for kidnapping a woman came and went.

Id. at 60 (citations omitted).

The contrast with the facts here is striking. Van Hise and Asch used their full real names in their communications. (GX 201, GX 203) Van Hise and Asch, and Asch and Meltz, also had face-to-face meetings. Indeed, Asch had been to Meltz's home, and had seen the basement where (1) Meltz had allegedly strangled two women; and (2) the conspirators proposed that Bolice Van Hise would be tortured and murdered. (GX 252; Tr. 449-50, 668) While the in-person meetings preceded the conspiratorial agreements charged in the S4 Indictment, they

evince a seriousness of purpose that the jury was entitled to consider in evaluating whether the

Defendants possessed the requisite intent to carry out their agreed-upon plans.

Asch and Meltz also spoke regularly by telephone. (See, e.g., GX 401-402, GX

404-406, GX 409, GX 413, GX 418) As Asch himself commented to Darren: "given my

experience with communicating with guys on line, I find that if they are willing to talk by phone,

that's a big step towards saying[,] yeah[,] they are interested and they are most likely real. . . [.]"

(GX 353-T (Jan. 25, 2013) at 9)[24]

Van Hise invited Asch to his hometown of Trenton. Asch took the train down

from Manhattan to Trenton (Tr. 72), where he met Van Hise. There the two men drove around

in Van Hise's white station wagon, surveying potential venues from which to abduct women, and

locations at which their bodies could later be "dumped." (GX 205, GX 252, GX 352-T; Tr. 56,

72, 122, 129) And Asch later recounted to Meltz his visit with Van Hise in Trenton.[25] (GX 208)

---

[24] Although there is no evidence that Van Hise spoke by telephone with Asch or Meltz, that was apparently because Van Hise could not afford a phone. (See GX 361-T (Jan. 5, 2013) at 1 (Asch testimony that Van Hise communicated over the Internet because "he couldn't afford to have his own phone [. . . .]"))

[25] Citing Valle, Asch and Van Hise attempt to minimize the significance of their in-person meeting in Trenton. Defendants argue that this meeting is no more indicative of the genuineness of their agreement than was Valle's lunch meeting with a purported kidnapping victim, Kimberly Sauer. (Van Hise R. 33 Reply (Dkt. No. 363) at 7-8; Asch R. 33 Reply (Dkt. No. 377) at 8-9) There are critical differences between the two meetings, however.

As this Court explained in Valle:

> [N]o reasonable juror could infer from Valle's trip to Maryland [to visit Sauer] that he intended to enter into a genuine agreement with Moody Blues to kidnap Sauer, or that he had the specific intent to kidnap her. Given that (1) Valle and Moody Blues never again discuss kidnapping Sauer after Valle's July 22 lunch with her in Maryland; (2) Valle takes no steps of any sort in furtherance of kidnapping Sauer after the trip to Maryland; (3) after the trip to Maryland, Valle and Moody Blues move on to discussing a different woman – Kristen Ponticelli; and (4) the target date of September 2, 2012, for kidnapping Sauer comes and goes without discussion, inquiry, or comment from Valle or Moody Blues, the only reasonable

In March 2012, Van Hise asks Asch to return for another visit to Trenton, so that they "can look at some good spots to dump and also i can show you some of the girls i want" and "start planning." (GX 203 (Mar. 1, 2012, at 15:42:45 -0500, 15:44:50 -0500, 3:46 p.m.)) Asch responds that that "sounds good," but explains that he "may not be able to get anywhere for a while," because his partner is ill. (GX 205 (Mar. 1, 2012, 4:09 pm)

Van Hise, Asch, and Meltz also shared true information about their circumstances and what was happening in their lives. For example, Van Hise's co-conspirators were aware of his approximate age and the city in which he lived. (See GX 204 (Mar 1, 2012, 3:56 pm), GX 208 (May 30, 2012, 21:21:25 (UTC)), GX 361-T (Jan. 5, 2013) at 3; Tr. 56, 1139) Asch was aware that Meltz was a retired police officer, and that he had moved to take a job as a security guard at a Massachusetts VA hospital. (Tr. 449-450; GX 265 (Nov. 21, 2012, 22:04:54 (UTC) to 22:10:32 (UTC)), GX 352-T (Jan. 18, 2013) at 2) Van Hise, Asch, and Meltz shared numerous, apparently accurate details about mundane matters in their lives: Meltz's move for a new job in Massachusetts; his wife's surgery; the sickness of Asch's partner; and sick pets. (GX 203 (Mar 1, 2012, 3:44 pm), GX 207 (May 30, 2012, 21:07:11 (UTC) to 21:20:36 (UTC)), GX 250 (Sept. 5, 2012, 22:26:08 (UTC)), GX 262 (Oct. 23, 2012, 00:11:30 (UTC) to 00:12:41 (UTC), GX 265 (Nov. 21, 2012, 22:04:54 (UTC) to 22:10:32 (UTC))) Van Hise told Asch and Meltz that his

inference flowing from the Maryland trip is that it was the culmination of Valle's fantasy concerning Sauer, and not a step toward actually kidnapping her.

Valle, 301 F.R.D. at 101 (citation omitted). Here, by contrast, Van Hise, Asch, and Meltz repeatedly allude to Van Hise and Asch's prior meeting in Trenton, and that meeting presages more detailed discussion and actions concerning particular victims and kidnapping plans. In short, Valle's brunch with his former college friend in Maryland is qualitatively very different from Van Hise and Asch's meeting in Trenton, because while the former marked the end of Valle's fantasy about kidnapping his college friend, the Trenton meeting provided the foundation for more serious and detailed discussions between Van Hise and Asch about kidnapping Van Hise's family members.

wife suffered from depression and had attempted suicide, and that she was pregnant at the time her kidnapping was discussed. (GX 228 (Aug. 2, 2012, 11:58:13 -0700 to 12:08:32 -0700), GX 241 (Aug. 2, 2012, 12:39:56 -0700)) Van Hise also told Asch – in August 2012 – that he and his wife were "in the process of a divorce," and that his wife was then living with his sister-in-law. (GX 237 (Aug 16, 2012, 13:30:41 -0700), GX 241 (Aug 16, 2012, 11:23:59 PDT -0700)) All of these statements were true. (See Tr. 1252-53 (Bolice Van Hise testimony that she told Trenton police in August 2012 that she and Van Hise had broken up); Tr. 1278 (Bolice Van Hise testimony that she was pregnant in August 2012); Tr. 1279-80 (Bolice Van Hise testimony that she suffered from depression and had attempted suicide); Tr. 237, 1253, 1258 (Sheri Davis and Bolice Van Hise testimony that Bolice had left Van Hise in the summer of 2012 and moved in with her sister))

Van Hise also provided Asch and Meltz with photographs of all the proposed victims (GX 226, GX 235, GX 246, GX 247), and accurately described their relationship to him. He also provided accurate location information for Sheri Davis and her children, including street and city. (GX 259 (Oct. 12, 2012, 11:33:18 -0700); Tr. 231, 1265-66 (Davis and Bolice Van Hise testimony that Sheri Davis lived on Eisenhower Avenue in Trenton)) A reasonable jury could likewise have concluded that Van Hise had provided Asch with Sheri Davis's true name, because agents recovered from Asch's computer a "web archive of [Sheri Davis's] Facebook page." (Tr. 994, 1103) Van Hise also told Asch and Meltz the true ages of Sheri Davis' children. (Tr. 233; GX 210 (July 3, 2012, 11:43:17 -0700 (PDT)), GX 226 (Aug 2, 2012, 11:47:08 -0700), GX 241 (16 Aug 2012 13:41:38 -0700))

This case does not involve Valle's practice of repeatedly setting "hard" dates for a kidnapping to occur, and that date passing with no kidnapping and no query from co-conspirators

as to why no kidnapping had occurred. While Van Hise and Asch attempt to analogize this case to the "vanishing plots" phenomenon seen in Valle (see Van Hise R. 33 Reply Br. (Dkt. No. 363) at 4-5; Asch R. 33 Reply Br. (Dkt. No. 377) at 8-9), the conspirators here never agreed on any particular target date for a kidnapping. The most that can be said is that on October 22, 2012, Asch told Van Hise that he and Meltz would be available on October 26, 2012, to help Van Hise kidnap his wife. (GX 259 (Oct. 22, 2012, 21:07:56 PDT)) Defendants make much of the fact that no kidnapping occurred on October 26, 2012, and that Van Hise was apparently grocery shopping with his grandmother when the FBI executed a search warrant at Van Hise's grandparents' home. (See, e.g., Asch R. 33 Reply Br. (Dkt. No. 377) at 10 ("[I]t was unequivocally established that Mr. Van Hise spent that day and evening grocery shopping with his grandmother. There was no subsequent discussion between Mr. Asch, Mr. Van Hise or Mr. Meltz about the date passing without incident.")) This argument, of course, ignores the fact that there was no evidence that Van Hise had confirmed that the kidnapping of Bolice Van Hise would take place on October 26, 2012. Moreover, given (1) Gilberto Valle's arrest on October 24, 2012, and the widespread publicity associated with that arrest; (2) Van Hise's Internet association with Valle; (3) the search of Van Hise's grandparents' residence on October 26, 2012; and (4) Van Hise's cooperation with the FBI, the jury could have rationally inferred that the Defendants ceased further communications about an October kidnapping due to these circumstances.

Finally, Van Hise claims that his electronic communications, like Valle's, contain numerous falsehoods, including his suggestion (1) to kidnap Sheri Davis after she left work, even though she was unemployed at the time; and (2) that Asch and Meltz pose as repair men who

need to fix a problem in "the basement," when Bolice Van Hise did not have access to the basement in her sister's building. (See Van Hise R. 33 Reply (Dkt. No. 363) at 9-10, 12)

While the jury was free to consider these alleged falsehoods in determining whether there was a genuine agreement to kidnap and the necessary criminal intent, they pale in comparison to the myriad lies and fantastical elements seen in Valle. As to Defendants' claim that Bolice Van Hise had no access to the basement of her sister's apartment building – and thus could not assist repair men in resolving any alleged problem in the basement – there is no evidence that Van Hise knew that she did not have such access.[26] And while Sheri Davis testified that she was unemployed during the summer of 2012 (Tr. 247), there is likewise no evidence that Van Hise was aware of that fact. In any event, even assuming that Van Hise was less than truthful as to these matters, the alleged falsehoods are not so numerous or patently

---

[26] Van Hise offered several other proposed ruses for the kidnapping of his wife that were likewise not rebutted or challenged by the defense. For example, in October 2012, Van Hise proposed that Asch "e-mail [Bolice Van Hise] saying your a lawyer who needs to talk to her about the car accident papers from last year that she has to sign[ . . . .]" (GX 259 (Oct. 11, 2012, 10:57:06 -0700)) Defense counsel did not challenge Van Hise's reference to a car accident and settlement. Similarly, Asch and Meltz discussed Van Hise's proposal that Asch lure Bolice to a meeting through a "money for sex" scheme. Asch reports that Van Hise told him that Van Hise has a "new car that [Bolice Van Hise] doesn't know about, and if someone else is in it other than him, she might [appear to perform a sex act]":

| **moretime2read:** | he thinks she will respond to an offer of money. he also has a new car that she doesn't know about, and if someone else is in it other than him, she might do it. |
| **ruhmal2001:** | strangle his wife together |
| **ruhmal2001:** | imagine the 3 of us choking her? |
| **moretime2read:** | we could do that. if he could communicate with her non-electronically and lure her with an offer of money for sex with someone in a car she doesn't know, it could work. i would love to have the three of us do her. |

(GX 262 (Oct. 23, 2012, 00:19:27 (UTC) to 00:21:11 (UTC))) Defense counsel did not challenge Van Hise's statement to Asch that Van Hise had purchased a new car.

incredible as to raise doubts about whether there was a genuine agreement to commit a kidnapping and the requisite criminal intent.

The Court concludes that the Government offered sufficient evidence to establish that Van Hise, Asch, and Meltz had the requisite criminal intent, and that the jury's verdict on this point is not against the weight of the evidence.

### c.    Overt Act

The sole overt act alleged in Count One of the S4 Indictment reads as follows:

> In or about the spring of 2011, MICHAEL VANHISE and ROBERT CHRISTOPHER ASCH, a/k/a "Chris," the defendants, met and discussed a plan to kidnap women.

(S4 Indictment (Dkt. No. 204) ¶ 3)  Asch and Van Hise contend that this meeting – which the evidence showed occurred in early 2012 in Trenton, New Jersey – occurred prior to the formation of the conspiratorial agreement to kidnap one or more of Van Hise's family members, and therefore cannot constitute an overt act in furtherance of the charged conspiracy.  (Def. Joint Br. (Dkt. No. 334) at 5)

This argument provides no basis for setting aside the jury's verdict, however, because the law is "'well-established'" that "'the overt act element of a conspiracy charge may be satisfied by an overt act that is not specified in the indictment, at least so long [as] there is no prejudice to the defendant.'" United States v. Salmonese, 352 F.3d 608, 619 (2d Cir. 2003) (quoting United States v. Frank, 156 F.3d 332, 337 (2d Cir. 1998))).  As this Court stated in its instructions to the jury:

> [T]he overt act need not have been alleged in the indictment.  It can be any overt act, whether alleged in the indictment or not, if you are convinced beyond a reasonable doubt that it was committed by a coconspirator in furtherance of the conspiracy and while the conspiracy was in existence, and within the Southern District of New York.

(Tr. 1524)

Here, the Government offered evidence of numerous overt acts committed by members of the alleged conspiracy in the Southern District of New York. Those acts included, (1) Van Hise emailing photographs of the targets of the kidnapping plot to Asch, who lived in Manhattan (GX 234, GX 235); (2) Asch's numerous emails to Van Hise providing advice on how to commit the kidnapping; (3) Asch's emails to Meltz soliciting his assistance and advice concerning the plot to kidnap Van Hise's family members; and (4) Van Hise's email to Asch stating the street and city where Bolice Van Hise, Sheri Davis, and their children were living. (GX 259). See United States v. Lange, 834 F.3d 58, 74 (2d Cir. 2016) (noting that jury could find that defendant's "email communication . . . constituted overt act[] in furtherance of the objectives of the conspiracy to commit securities fraud" (citing United States v. Tzolov, 642 F.3d 314, 320 (2d Cir. 2011); United States v. Rommy, 506 F.3d 108, 119 (2d Cir. 2007))). Any one of these acts is sufficient to satisfy the overt act requirement, and Defendants have not alleged insufficient notice concerning this evidence.

The Court concludes that the Government offered sufficient evidence to demonstrate that one or more co-conspirators committed an overt act in furtherance of the conspiracy charged in Count One of the S4 Indictment.

*   *   *   *

Defendants' joint motion for a judgment of acquittal, or for a new trial, on Count One, will be denied.

### 2.   Count Two

Asch argues that, as to Count Two, the Government did not offer sufficient evidence that (1) a genuine conspiratorial agreement existed between Asch and Meltz; or (2) Asch acted with criminal intent – i.e., intended to commit an actual kidnapping.

### a.     **Existence of an Unlawful Agreement**

Beginning in early January 2013, Asch began discussing with Darren – an undercover FBI agent – his desire to kidnap and murder women. (Tr. 448-53, 682) Asch also identified Meltz as one of the men with whom he had discussed committing kidnappings. (Tr. 452-53) Asch assured Darren that he and Meltz were "comfortable going to the next level," and wanted to begin committing actual kidnappings. (GX 352-T at 4) As discussed above, Darren focused Asch's attention on a female undercover agent as a potential kidnapping victim. (Tr. 493-94; GX 701-A)

In early March 2013, Asch told Darren that Meltz was also interested in participating in the kidnapping of the female undercover agent. Asch gave Darren Meltz's telephone number, and in a March 6, 2013 telephone call, Meltz and Darren discussed the kidnapping of the female undercover agent. (Tr. 499-500) A wiretap installed on Asch's home telephone in February 2013 captured numerous telephone conversations between Asch and Meltz in which they discuss the kidnapping and murder of women, including the planned kidnapping, rape, torture, and murder of the female undercover agent. (GX 401, GX 402, GX 404-406, GX 409, GX 413, GX 415, GX 418)

Meltz spoke with Darren at least eight times by telephone concerning the plot to kidnap the female undercover agent, and on April 14, 2013, he met with Darren at a New Jersey restaurant. During this meeting, Meltz offered advice concerning, _inter alia_, methods for avoiding detection and disposing of the female undercover agent's body. (Tr. 574-76) With Meltz's advice and assistance, Asch – who had conducted extensive Internet research concerning methods for incapacitating a kidnapping victim (GX 1101-1111) – purchased a taser at a Pennsylvania gun show. (Tr. 813-14, 820-21; GX 404, GX 319) Asch also prepared a list of items that he intended to use to incapacitate, restrain, and sexually torture the victim, and then

77

went about purchasing these items. (Tr. 534-36, 539, 544-52; GX 603B) He also conducted surveillance of the female undercover agent on multiple occasions. (Tr. 503-04, 506-07, 576; GX 355) At meetings with Darren and Joe – two FBI undercover agents posing as men who were intent on carrying out a real kidnapping of a woman – Asch produced numerous items he wanted to use in the kidnapping and the sexual torture that would follow, including the taser he had purchased in Pennsylvania, rope, a hammer, duct tape, cable ties, speculums, skewers, pliers, a dental retractor, and a leg-spreader. (Tr. 577, 579-91; GX 604, GX 604A-604K, GX 605, GX 605A-M)

Despite this overwhelming evidence of an unlawful agreement between Asch and Meltz to kidnap the female undercover agent, Asch complains that the Government's proof lacks sufficient specificity: "[N]o specific plan was ever agreed upon. No specific date was ever discussed and an actual plan was never settled." (Asch R. 33 Br. (Dkt. No. 337) at 9) While Asch concedes that he discussed "various scenarios for abducting the female undercover," he contends that the alleged conspirators "never determined how they would do it, the roles each participant would play, where they would take the victim, what they would do with the victim, etc." (Id.)

As discussed above in connection with Count One, however, the law does not require the level of specificity that Asch demands. All that is required is that the conspirators agree on the "essential nature of the plan." McDermott, 245 F.3d at 137. That is because the "essence of a conspiracy is 'an agreement to commit an unlawful act,'" Jimenez Recio, 537 U.S. at 274 (2003) (quoting Iannelli, 420 U.S. at 777) (citation omitted), and while "the law does not punish criminal thoughts," in a criminal conspiracy "the criminal agreement itself is the actus reus." Shabani, 513 U.S. at 16.

78

Here, the evidence shows that Asch and Meltz had agreed (1) on a particular victim (the female undercover agent) (GX 401-T, GX 402-T); (2) on a method for incapacitating her (the taser) (GX 402-T, GX 404-T); (3) that the victim would be captured alive and transported by van from the abduction site to a secluded location in the Hudson Valley (GX 402-T, GX 404-T); (4) that she would be sexually tortured before being killed (GX 404-T); and (5) that the conspirators would take certain precautions to avoid detection by law enforcement, including avoiding toll roads (GX 402-T). Contrary to Asch's arguments, the lack of a fixed date or an even more particularized plan is not fatal to the Government's case. See United States v. Rea, 958 F.2d 1206, 1214 (2d Cir. 1992) ("[T]he coconspirators need not have agreed on the details of the conspiracy, so long as they have agreed on the essential nature of the plan; and their goals need not be congruent, so long as they are not at cross-purposes." (citations omitted)).

Asch also argues that – because Meltz did not plan to be present on the day of the kidnapping – no conspiratorial agreement existed. (Asch R. 33 Br. (Dkt. No. 337) at 10; see Tr. 770-73 (Agent Spivack testimony that after Meltz was told that kidnapping would take place within a week or two of April 14, 2013, Meltz stated that he was not available, because of his wife's needs)) Asch's argument is misguided, however, because the law does not require that every member of a conspiracy be present for every significant act taken in furtherance of the conspiracy. As discussed above, once having agreed to pursue the same criminal objective, conspirators "may divide up the work, yet each is responsible for the acts of each other." Salinas, 522 U.S. at 63-64. Accordingly, while the jury was free to consider Meltz's statements that he could not be present on the day of the abduction, his alleged inability to be present is not dispositive on the issue of whether he and Asch had entered into a conspiratorial agreement.

The Government offered ample evidence demonstrating that Meltz was committed to achieving the conspiracy's objective and took concrete steps to help achieve that objective. Indeed, in numerous, lengthy conversations with both Asch and Darren, Meltz confirmed his interest in participating in the kidnapping, rape, torture, and murder of the female undercover agent. (Tr. 499-500; GX 401-402, GX 404-406, GX 409, GX 413, GX 415, GX 418) Meltz also utilized his law enforcement background and purported past experiences strangling women to provide Asch with strategic advice for successfully committing the kidnapping without getting caught. (See, e.g., GX 404-T (Mar. 3, 2013) at 3-4, 413-T (Mar. 14, 2013) at 7, 409-T (Mar. 10, 2013) at 8) Meltz and Asch also had lengthy conversations about how a taser would be useful in effecting a kidnapping. (GX 404) Meltz suggested that Asch purchase a taser at a gun show in Pennsylvania – advice that Asch acted on – and offered to assist Asch in making that purchase:

> RM: You know what I could . . . it didn't even dawn on me. I could walk into a gun shop. There's hundred of (UI) here.
>
> CA: Yeah.
>
> RM: And just, and just see what's available, and what you have to do to buy one . . .
>
> CA: Yeah.
>
> RM: The whole nine yards. I can certainly investigate that part of it.

(GX 404-T (Mar. 2, 2013) at 2)

As promised, Meltz later visited a gun store to look for a taser that could be used in the abduction of the female undercover agent:

> RM: I did go to a gun store here.
>
> CA: Oh you did? [. . .]
>
> RM: Yep, yesterday morning I stopped in at a gun store.

CA:     Yeah.

RM:     They didn't have any out.

CA:     Uh huh.

RM:     And, when I talked to the guy, I said yeah, I'm from New Jersey, you know. He says[,] well I can't sell you anything anyway, so.

CA:     Really?

RM:     Cause I [didn't] asked him about certain things. He says no, I can't sell it to you. Because, I'm from out of state. And so the only way they'll sell it in New Jersey is to ship it to a New Jersey firearms dealer, until I change my license.

CA:     Oh, I see. Huh.

RM:     Once I change my license and my registration, it will be able to be done.

(GX 409-T (Mar. 10, 2013) at 3)

Meltz also gave Asch advice concerning how to dispose of a body, and the need to avoid leaving DNA at the crime scene. (GX 404-T, GX 413-T, GX 418-T)

This evidence was plainly sufficient to permit a reasonable jury to conclude that Meltz knowingly entered into a conspiratorial agreement with Asch to kidnap the female undercover agent.[27]

---

[27] Citing to dicta in United States v. Lechuga, 994 F.2d 346 (7th Cir. 1993), Asch argues that, "[a]t best, Meltz arguably aided and abetted a kidnapping plan by offering advice, but was not a member of the conspiracy." (Asch R. 33 Br. (Dkt. No. 337) at 13) In Lechuga, the court commented that "[a] person who sells a gun knowing that the buyer intends to murder someone may or may not be an aider or abettor of the murder, but he is not a conspirator, because he and his buyer do not have an agreement to murder anyone." Lechuga, 994 F.2d at 349. Whatever the criminal liability of a disinterested gun seller, there is ample evidence here that Meltz wholeheartedly entered into a conspiracy to kidnap the female undercover agent, and took concrete steps to assist his fellow co-conspirator – Asch – in achieving that objective. Stated another way, Meltz not only advised Asch on how to obtain a taser that he knew would be used to commit a kidnapping; a rational jury could have concluded that Meltz's purpose in advising Asch on how to obtain a taser was to further the objective of the conspiracy. "[W]hen a person possessing such knowledge agrees to facilitate or actually facilitates the crime, a jury may reasonably infer from this combination of knowledge and action that the defendant has adopted the known goal of the crime as his own." United States v. Heras, 609 F.3d 101, 106-07 (2d Cir.

Finally, Asch argues that "Meltz did not believe [that] Mr. Asch intended to commit a criminal act," and that accordingly no conspiratorial agreement existed. (Asch R. 33 Br. (Dkt. No. 337) at 10) In making this argument, Asch relies on Meltz's response to Agent Spivack's question – seconds before Meltz's arrest on April 14, 2013 – as to whether Meltz believed that Asch "would go through with it." (Id. at 11) As he did at trial, Asch contends that Meltz told Agent Spivack that "He wouldn't." (Id.; see Asch DX K)

As the Court discussed at length above, there is a factual dispute about Meltz's response to Agent Spivack's question. The Government contends that Meltz answered, "He would [. . . .]" (GX 357-T-2; Tr. 1078)

While Asch asserts that "the Court should find that no reasonable juror could interpret the recordings as Mr. Meltz telling Agent Spivack that he believed Mr. Asch was serious about going through with an actual kidnapping" (Asch R. 33 Br. (Dkt. No. 337) at 11), this Court cannot make that finding. As the Court stated at trial, "it's very difficult to hear what's being said and it's said very quickly." (Tr. 932) Having listened to the tape many times, the Court concluded that the issue of what was recorded on tape should be resolved by the jury, and not by the Court. Accordingly, as explained above, competing transcripts were provided to the jury, and the recording at issue was played at least eight times for the jury. (Tr. 1048-49)

As the finders of fact, the jurors were entitled to determine for themselves what was captured on the recordings, and to consider that finding in weighing Agent Spivack's credibility. In seeking a contrary ruling, Asch invites this Court to usurp the jury's role.

---

2010) (citations omitted). "The government does not have to prove that the defendant intended to commit the underlying offense himself/herself." Ocasio v. United States, 136 S. Ct. 1423, 1429 (2016) (citation omitted). "Instead, '[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.'" Ocasio, 136 S. Ct. at 1429-30 (quoting Salinas, 522 U.S. at 64).

In any event, even if the jury accepted Asch's version of what Meltz said seconds before his arrest, the jury could have nevertheless concluded that Meltz believed that Asch was serious about committing a kidnapping. The jury had read and listened to countless conversations between the two men in which they repeatedly emphasize their interest in committing a real kidnapping and murder. Indeed, that mutual interest was the premise for their relationship. Moreover, at an earlier point in the April 14, 2013 meeting, Meltz – seconds after referring to Asch – comments to Agent Spivack, "There's not a lot of us out there. There's a lot of guys who fantasize but there's not a lot of us out there." (GX 358-T (Apr. 14, 2013) at 1) A reasonable jury could have concluded that the "us" Meltz was referring to included Asch.

Finally, the jurors could have inferred that Meltz's suspicions had been aroused by Agent Spivack's awkward question, which introduced a significant topic after the meeting, as the two were walking to their cars in the parking lot. (Tr. 773-74) The jury had heard evidence that Meltz had had a long career in law enforcement, and might reasonably have concluded that Meltz sensed – in the seconds before his arrest – that "Darren" was not who he pretended to be.

The Court concludes that the Government offered sufficient evidence that a genuine conspiratorial agreement existed between Asch and Meltz to kidnap the female undercover agent.

### b.   Criminal Intent

Asch contends that "the government failed to prove that [he] intended to actually commit a kidnapping." (Asch R. 33 Br. (Dkt. No. 337) at 13) According to Asch, his "willingness to collect equipment and watch the victim from afar was not sufficient evidence to demonstrate his criminal intent," because "[t]he agents never tested [him] to see if he would actually go through with the commission of the crime." (Id. at 14)

The law regarding conspiracy and criminal intent does not require the Government to delay arrest until a defendant actually commits the substantive crime that is the object of the conspiracy. Here, the Government offered overwhelming evidence of Asch's criminal intent. That evidence includes numerous recorded conversations in which Asch repeatedly reiterates his desire to follow through with the plan to kidnap the female undercover agent. (See, e.g., GX 352-T (Jan. 18, 2013 (Asch to Darren: when asked whether he could follow through on a kidnapping, Asch states, "I think I'm comfortable enough uhm you know to, I think, I'm quite certain that I could because uhm and not really suffering the guilt"); see also GX 401-402, GX 404-406, GX 409, GX 413, GX 415, GX 418) Asch also rejects other men as co-conspirators when they express doubt as to their ability to complete a kidnapping. (See, e.g., GX 402-T (Feb. 22, 2013) at 7 (recorded telephone call in which Asch tells Meltz, "[I]t turns out Rob in Boston, Darren did talk to him, and Rob said he didn't think he could really go through with it, which was a surprise to me [. . .] [s]o I'm sort of leaving him out of the picture at the moment.")) Finally, in addition to Asch's own statements about his desire to commit a real kidnapping, the jury was entitled to consider his purchase of a taser – which he travelled to Pennsylvania to procure – and the various sexual torture devices and other kidnapping equipment that Asch brought to his meetings with the undercover agents. (GX 603, GX 603A-603Z, GX 604, GX 604A-604K, GX 605, GX 605A-605M, GX 606, GX 606A-606G) A reasonable jury could have inferred that Asch purchased this equipment because he intended to use it.

The Court concludes that the Government offered sufficient evidence that Asch acted with criminal intent in entering into the conspiracy to kidnap the female undercover agent.

*    *    *    *

Asch's motion for a judgment of acquittal or for a new trial on Count Two will be denied.

## II.    VAN HISE'S MOTION FOR A NEW TRIAL BASED ON IMPROPER JOINDER

As noted above, this Court denied Van Hise's motion for a severance prior to trial. United States v. Van Hise, No. S4 12 Cr. 847(PGG), 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013). Van Hise now moves for a new trial pursuant to Rule 33, arguing that he was denied a fair trial on Count One as a result of prejudicial spillover from the evidence admitted as to Count Two.

### A.    Legal Standard

Federal Rule of Criminal Procedure 8(b) provides that two or more defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Joinder of defendants in a multi-count indictment is proper where the charged conduct is "'unified by some substantial identity of facts or participants' or 'arise[s] out of a common plan or scheme.'" United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (quoting United States v. Porter, 821 F.2d 968, 972 (4th Cir. 1987)) (citation omitted); accord United States v. Rittweger, 524 F.3d 171, 178 (2d Cir. 2008). Joinder may be appropriate even where a defendant is not charged in a conspiracy count naming other defendants. Rittweger, 524 F.3d at 178 (citing United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003)).[28]

---

[28] As this Court explained in denying Van Hise's severance motion,

> joinder is proper when "common factual elements" of different charges are readily apparent. United States v. Turoff, 853 F.2d 1037, 1044 (2d Cir. 1988). Thus, "counts might be 'connected' if one of the offenses 'depend[s] upon [] or necessarily l[leads] to the commission of the other,' or if proof of one act 'constitute[s][] or depend[s] upon proof of the other." United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2006) (quoting United States v. Halper, 590 F.2d 422,

Federal Rule of Criminal Procedure 14 provides that even where joinder is proper under Rule 8(b), a court may nonetheless grant a severance "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government." In order to prevail on a severance motion under Rule 14, however, a "'defendant must show not simply some prejudice but substantial prejudice.'" United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004) (quoting United States v. Werner, 620 F.2d 920, 928 (2d Cir. 1980)) (emphasis in Sampson). The defendant has the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotation marks and citation omitted). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of [a defendant], or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993). Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Zafiro, 506 U.S. at 539 (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

---

429 (2d Cir. 1978)) (alterations in Shellef). Similarly, where one offense stems from the other, that link "provides a sound basis for joinder under Rule 8(b)." Turoff, 853 F.2d at 1044. Finally, where two charged conspiracies are "intertwined" with each other, they are sufficiently related to justify joinder. Attanasio, 870 F.2d at 815.

Van Hise, 2013 WL 6877319, at *7. Here, the Asch/Meltz conspiracy charged in Count Two was closely intertwined with the Van Hise/Asch/Meltz conspiracy charged in Count One. The Government learned of Asch and Meltz as a result of its investigation of Van Hise, and it was as a result of Van Hise's cooperation that an undercover agent was introduced to Asch. (Tr. 66, 72, 140-42, 391, 432, 446) Asch also emailed "Darren" – the undercover agent – for the first time the day after Van Hise's arrest, and as a result of that arrest. (GX 802 (Jan. 5, 2013, 12:15 a.m.)) Because Van Hise was a critical link between the two conspiracies, there were multiple allusions made to him during the later conspiracy. (See, e.g., GX 361-T (Jan. 5, 2013), GX 352-T (Jan. 18, 2013) at 1-2; Tr. 448-49)

Moreover, "[i]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in [a] separate trial[]." Id. at 540 (citations omitted). Indeed, "Rules 8(b) and 14 are designed 'to promote economy and efficiency and to avoid a multiplicity of trials [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial.'" Id. (quoting Bruton, 391 U.S. at 130) (alteration in Zafiro).

Substantial prejudice may be found where evidence admissible against jointly-tried co-defendants "in some way affected the jury's ability fairly and rationally to evaluate the evidence of . . . guilt." United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996). "[T]o the extent that there exists some greater quantum of proof implicating one defendant compared to another, [however,] this fact does not alone justify severance, for 'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.'" United States v. Kahale, 789 F. Supp. 2d 359, 393 (E.D.N.Y. 2009) (quoting United States v. Scarpa, 913 F.2d 993, 1015 (2d Cir. 1990)); see also United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993) ("[J]oint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible.").

The Second Circuit has long recognized that "the fact that evidence may be admissible against one defendant but not another does not require a severance." United States v. Carson, 702 F.2d 351, 367 (2d Cir. 1983). A limiting instruction is sufficient to cure any potential for spillover prejudice. See United State v. DeVillio, 983 F.2d 1185, 1192-93 (2d Cir. 1993) (court's "explicit limiting instruction to the jurors that testimony [concerning an attempted murder by co-defendants] could not be used as evidence against [defendants not charged with the attempted murder]" was sufficient to protect against spillover prejudice); United States v. Chang

An-Lo, 851 F.2d 547, 556 (2d Cir. 1988) (defendants claimed that the "overwhelming majority of the evidence introduced at trial was not admissible against them"; Second Circuit concluded that district judge's instruction to "jury to consider the case against each defendant separately, and [explanation] that a person may associate with or even be friendly with a criminal without being one himself," was sufficient to protect against spillover prejudice).

The Second Circuit has also stated that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993). A district court's denial of a severance motion is reviewed for abuse of discretion, which will not be found unless "the denial caused the defendant 'substantial prejudice . . . amounting to a miscarriage of justice.'" United States v. O'Connor, 650 F.3d 839, 859 (2d Cir. 2011) (quoting United States v. Bari, 750 F.2d 1169, 1177 (2d Cir. 1984)) (citations omitted).

B. **Analysis**

Van Hise contends that he is entitled to a new trial, because he "was prejudiced by the magnitude and nature of the evidence against Mr. Asch in Count Two." (Van Hise R. 33 Br. (Dkt. No. 316) at 12) Van Hise argues that, "[o]nly against Mr. Asch, the jury heard evidence of surveillance conducted by Mr. Asch; heard two days worth of phone calls in which Mr. Asch discussed his plans with the undercover officer; and viewed two literal cart loads of physical evidence including a leg spreader, a stun gun, mouth spreaders, a speculum, bleach, needles, and other devices that could be used for torture." (Id. at 15) According to Van Hise, "the jury could not be expected to set all of this information aside when determining whether Mr. Van Hise agreed to commit a kidnapping." (Id.)

Throughout the trial, however, this Court repeatedly instructed the jury that certain evidence was only being admitted against Asch in relation to Count Two, and could not

be considered against Van Hise. The wording and timing of these instructions was discussed with counsel in detail outside the presence of the jury (see, e.g., Tr. 221-22; 281, 283-86, 412-420), and Van Hise did not object to the procedures that this Court employed to ensure that the jury properly considered evidence that was admissible only as to Asch. (Id.). Indeed, on at least twelve separate occasions, the Court instructed the jury that particular evidence could not be considered against Van Hise. (See Tr. 469-70, 498, 503, 508, 534, 580, 749, 815, 856, 877, 1018, 1081) Moreover, in the jury charge, the Court reviewed in detail the evidence that could only be considered as against Asch:

> As I have . . . indicated, much of the evidence in this case was received for a limited purpose. I'm going to review that evidence with you now.
>
> During trial, the government introduced the following physical evidence against Mr. Asch: Government Exhibit 603, 603A to 603-[Z] are items allegedly recovered from a bag that Mr. Asch brought to a meeting with undercover agents on March 13th, 2013. Government exhibits 604, 604A through 604K, 605, 605A through 605M, 606, and 606A through 606G are items allegedly recovered from bags that Mr. Asch brought to a meeting with undercover agents on April 15th, 2013; and government exhibits 701A, 707A, 709A, and 711A are items allegedly recovered during a search of Mr. Asch's apartment. The government also introduced a number of photographs at trial, including government exhibits 501 through 508, which the Government alleges are surveillance photos taken during Mr. Asch's meetings with undercover agents; government exhibits 521 through 523, which the government alleges are photographs of Mr. Asch taken at a gun show on April 6, 2013; government exhibit 701, 702, 707, 709 through 711, 713 and 714 which the government alleges are photographs of items seized during a search of Mr. Asch's apartment on April 15th, 2013; and government exhibit 730, 737 through 739 and 741 through 742 which the government alleges are photographs depicting the interior of Mr. Asch's apartment. All of these exhibits are relevant only to Mr. Asch. You are not to consider this evidence in your deliberation[s] regarding Mr. Van Hise.
>
> Government exhibits 601 A, 601B, 601B-1, 601C, 601C-1, 1100 through 1113, 1121 through 1126 and 1128 through 1161 reflect evidence allegedly obtained by the FBI from Mr. Asch's computer. Government Exhibit 601A concerns evidence about searches allegedly performed on Mr. Asch's computer. This exhibit may be considered by you as to Mr. Van Hise only to the extent that the alleged searches took place prior to October 26, 2012.

The remaining exhibits I just listed may be considered by you only as to Mr. Asch.

The government contends that government exhibits 802 through 813 reflect e-mail communications between Mr. Asch and an FBI undercover agent. These exhibits may be considered by you only as to Mr. Asch.

. . .

There is evidence that Mr. Asch made statements to undercover FBI agents. As a general rule, none of the statements made by Mr. Asch to FBI agents may be considered by you in connection with your determination as to Mr. Van Hise's guilt. However, consistent with the instruction I gave you during the trial, government exhibits 301, 305, 352, 353, 361, 402, and 405 may be considered by you as against Mr. Van Hise, to the extent that Mr. Asch mentions Mr. Van Hise in these conversations. The same rule applies to testimony from the undercover agent about his meetings with Mr. Asch to the extent the agent testified to statements made by Mr. Asch about his activities with Mr. Van Hise.

(Tr. 1503-05)

> The Court also instructed the jury that it would be

asked to render separate findings as to each defendant and as to each count. Accordingly, you must consider, as to each defendant and as to each count, whether the government has met its burden.

(Tr. 1512; see also Tr. 1513)

The Second Circuit has repeatedly found that appropriate jury instructions are adequate to address a risk of "spillover" prejudice. See, e.g., United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003) (rejecting prejudicial spillover claim where "the district court explicitly instructed the jury to consider the defendants individually"); Hernandez, 85 F.3d at 1029-30 (rejecting prejudicial spillover claim where "the district court instructed the jury that it was required to consider evidence against each defendant individually for each count"). Van Hise did not challenge at trial, and does not challenge here, the substance of the limiting instructions this Court repeatedly stated, nor has he explained why these instructions were insufficient to ensure that he would not suffer unfair prejudice arising from the evidence introduced as to Count

Two.  Because Van Hise has provided no basis for this Court to depart from the "general assumption that juries follow the instructions they are given," <u>United States v. Agrawal</u>, 726 F.3d 235, 258 (2d Cir. 2013), his motion for a new trial will be denied.[29]

## **CONCLUSION**

For the reasons stated above, the Defendants' motions for a judgment of acquittal or for a new trial, are denied.

Dated: New York, New York
       August 8, 2017

SO ORDERED.

_Paul A. Gardephe_

Paul G. Gardephe
United States District Judge

---

[29]  While the physical evidence introduced against Asch on Count Two was compelling, the evidence concerning Van Hise's repeated, fervently expressed desire to kidnap, sexually assault, and murder his wife, his sister-in-law, and the sister-in-law's children, was no less compelling.